**Robert A. FALISE; Louis Klein, Jr.; Frank Macchiarola; and Christian E. Markety, Jr. as Trustees, Plaintiffs,**

**v.**

**The AMERICAN TOBACCO COMPANY; R.J. Reynolds Tobacco Company; B.A.T. Industries, PLC; Brown & Williamson Tobacco Corporation; Philip Morris Incorporated; Liggett Group, Inc.; and Lorillard Tobacco Company, Defendants.**

**No. 99 CV 7392.**

United States District Court, E.D. New York.

May 1, 2000.

Orrick, Herrington & Sutcliffe, LLP, James L. Stengel, Peter Bicks, New York,

NY, Kazan, McClain, Edises, Simon & Abrams, Steven Kazan, Oakland, CA, Ness, Motley, Loadholt, Richardson & Poole, Ronald Motley, Mt. Pleasant, SC, for Plaintiffs.

Womble Carlyle Sandridge & Rice, PLLC, Thomas D. Schroeder, Bonnie Kay Donahue, Winston–Salem, NC, R. Dal Burton, Atlanta, GA, for Defendant R.J. Reynolds Tobacco Company.

Greenburg Traurig, Alan Mansfield, Stephen L. Saxl, New York, NY, for Defendants Lorillard Tobacco Company, Philip Morris Incorporated and R.J. Reynolds Tobacco Company and Liaison Counsel for Defendants.

Kirkland & Ellis, David M. Bernick, James Munson, Deirdre A. Fox, Chicago, IL, for Defendants The American Tobacco Company and Brown & Williamson Tobacco Corporation, individually as successor by merger to the American Tobacco Company.

Simpson Thacher & Bartlett, Joseph M. McLaughlin, Jr., Adam Stein, New York, NY, for Defendant B.A.T. Industries.

Shook, Hardy & Bacon LLP, Gary Long, Gay Tedder, Terrence Sexton, Andrew Carpenter, Kansas City, MO, for Defendants Lorillard Tobacco Company and Philip Morris Incorporated.

Winston & Strawn, Dan Webb, Jeffrey M. Wagner, Chicago, IL, for Defendant Philip Morris Incorporated.

Riker Danzig Scherer Hyland & Perretti, Alan Kraus, Keith Weingold, Morristown, NJ, for Defendant R.J. Reynolds Tobacco. Co., Inc.

## MEMORANDUM and ORDER

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I INTRODUCTION ......................................................321

II FACTS ............................................................323
   A. Asbestos ......................................................323
      1. Uses and Production ......................................323
      2. Exposure ................................................323
      3. Health Hazards ..........................................324
      4. Industry Coverup ........................................324
      5. Litigation and Settlement ................................325
   B. Tobacco ......................................................326
      1. Smoking ................................................326
      2. Synergy ................................................327
      3. Conspiracy ..............................................328
         a. Synergy Knowledge ..................................328
         b. Synergy Coverup ....................................328
         c. Broader Tobacco Conspiracy ..........................329
         d. Tobacco's Enterprises ...............................332

III SUMMARY JUDGMENT STANDARD ..................................333

IV SECTION 1962(c)-RELATED CLAIMS ................................333
   A. Causation .....................................................333
      1. Factual Causation: Reliance ..............................333
         a. Reliance Showing ..................................335
         b. Application to RICO Settlement and Litigation Actions ..........335
         c. Application to RICO Direct Payment Action ...............337
      2. Proximate Causation: Remoteness ..........................338
         a. Incorporation of Proximate Causation into Civil RICO ..........338
         b. Holmes ............................................339
         c. Laborers Local 17 ..................................340
         d. Application to RICO Direct Payment Action ...............342
            i. Indirectness and Intervening Forces .................342

        ii.  Duplicative Recovery and Complex Damage Apportionment.....344
        iii. Ability of More Direct Victims to Remedy Violation...........345
        iv.  Specific Intent .........................................346
  B.  Statute of Limitations ...........................................347

V  SECTION 1962(a) -RELATED CLAIM ....................................348
  A.  "Re–investment" Injury .........................................348
  B.  Other Investment Injuries .......................................349
      1.  Maintenance of Public Relations Machine.........................350
      2.  Maintenance of Litigation Machine .............................350
          a.  Noerr–Pennington Doctrine.................................350
          b.  Application of Noerr–Pennington Principles......................351

VI  SECTION 1962(d) -RELATED CLAIMS ...................................353

VII  STATE FRAUD ACTION ..............................................353
  A.  Choice of Law ..................................................353
  B.  Fraud .........................................................354
  C.  Statute of Limitations ..........................................355
  D.  Certification...................................................356

VIII  PREEMPTION ....................................................356

IX  CONCLUSION......................................................357

## I  INTRODUCTION

Defendants have moved for summary judgment. For the reasons indicated below, the cause will be tried.

In recent years, each branch of the federal government has addressed the sweeping allegations of the massive, sustained, and unprecedented fraud of the tobacco companies and their related entities (Tobacco) against the American public.

Congress has called the Chief Executives of the leading Cigarette manufacturers before it to testify. It has also subpoenaed thousands of documents. Releasing them on the internet has contributed much of the factual underpinning to the present case.

The Executive branch has responded by filing a multi-billion dollar civil-RICO action seeking recovery of monies spent on health costs for the indigent and the elderly because of tobacco use. Its attempt to exercise control over tobacco products by the Federal Food and Drug Administration on the ground that cigarettes were a device for delivering a deleterious drug—nicotine—was rejected by the Supreme Court on the ground that the FDA lacks statutory authority to regulate tobacco as a "drug." *See FDA v. Brown & Williamson Tobacco Corp.,* — U.S. ——, 120 S.Ct. 1291, 1315–16, — L.Ed.2d ——, (2000).

All nine Justices of the Court recognized the enormous national health problems created by the use of cigarettes and other tobacco products. *Id.* at 1296 (majority: "This case involves one of the most troubling public health problems facing our Nation today: the thousands of premature deaths that occur each year because of tobacco use."); *id.* at 1321 (Breyer, J., dissenting: "[E]ven though the [Tobacco] companies refused to acknowledge publicly (until only very recently) that the nicotine in cigarettes has chemically induced, and habit-forming, effects, the FDA recently has gained access to solid, documentary evidence proving that cigarette manufacturers have long known tobacco produces these effects within the body through the metabolizing of chemicals, and that they have long wanted their products to produce those effects in this way." (internal citations omitted)); *id.* at 1329 (Breyer, J., dissenting: "[T]he FDA obtained evidence sufficient to prove the necessary 'intent' .... This evidence, which first became available in the early 1990's, permitted the

agency to demonstrate that the tobacco companies knew nicotine achieved ... habituating effects through chemical ... means, even at a time when the companies were publicly denying such knowledge.").

The case at hand is only one of the many tobacco litigations underway in the state and federal court systems.

Plaintiffs are trustees of a Trust established in 1988 as a result of the bankruptcy of the Johns–Manville Corporation. The Manville Corporation lacked assets to pay judgments which would have been rendered against it for injuries suffered by millions of people exposed to its asbestos products. The Trust's primary responsibility is to ensure that those suffering asbestos-related injuries that may have been caused by Manville's products (Claimants) receive appropriate compensation.

Plaintiffs seek money damages from the major tobacco product manufacturers and related entities for their alleged role in contributing to the Trust's Claimants asbestos-related injuries. The essence of their contentions is that defendants misled the public, including the Trust's beneficiaries, the asbestos industry, and the Trust, through a decades long campaign of misrepresentations, misinformation and intentional omissions.

The initial complaint, filed on December 31, 1997 ("*Falise I* "), was dismissed on November 2, 1999 for lack of subject matter jurisdiction. *See Falise v. American Tobacco Co.*, 241 B.R. 48 (E.D.N.Y.1999). The present case (*Falise II* ) was filed on November 11, 1999, predicated on the same set of facts as *Falise I*, but relying on the Racketeer Influenced and Corrupt Organization Act ("RICO"), as a basis for subject matter jurisdiction. *See* 18 U.S.C. § 1964(c).

Plaintiffs advance a number of theories supporting a cause-of-action against the defendants. Four are based on alleged racketeering activity. *See* 18 U.S.C. § 1964(c).

I) Tobacco engaged in a fraudulent scheme of misinformation *directed at the Trust* to cover-up or minimize its contributing liability for the Claimants' injuries, causing the Trust to erroneously assume Tobacco's share of the Claimants' injuries and to settle claims for a greater percentage of damages than that for which the Trust is responsible, *see id.* § 1962(c) ("RICO Settlement Action");

II) Tobacco engaged in a fraudulent scheme of misinformation *directed at the Trust* to cover-up or minimize its contributing liability to the Claimants' injuries, causing the Trust not to implead Tobacco in asbestos-injury litigations, *see id.* § 1962(c) ("RICO Litigation Action");

III) Tobacco engaged in a fraudulent scheme of misinformation *directed at asbestos workers* (and the population at large) to encourage asbestos workers to smoke (and not to cease smoking). This caused more asbestos workers to contract asbestos-related diseases, and more severe asbestos-related diseases, than they otherwise would have, forcing the Trust to pay larger sums from its fixed and limited corpus to Claimants who smoked, adversely affecting its ability to fulfill its fiduciary responsibility to all present and future Claimants for whom it will have less funds available to compensate under its matrix payment plan, *see id.* § 1962(c) ("RICO Direct Payment Action"); and

IV) Tobacco invested racketeering income and proceeds from a RICO enterprise *directed at the population generally* to fund a scheme (*see supra* ¶ III) to cause the Trust to make greater payments than it otherwise would have, *see id.* § 1962(a) ("RICO Investment Action").

A fifth theory is based on fraud under state common-law. Plaintiffs contend Tobacco engaged in a fraudulent scheme di-

rected at asbestos-workers causing more serious asbestos-related injuries due to a smoking-asbestos synergy than would have been caused by asbestos alone, and that Tobacco did this in part with the specific intent to shift its share of the asbestos-related injuries to asbestos entities, including the Trust. ("State Fraud Action").

Defendants moved for summary judgment on all claims. Defendants also moved for dismissal based on preemption by the federal Cigarette Labeling and Advertising Act. *See* 15 U.S.C. §§ 1331–40.

By a preliminary order dated April 3, 2000, this court denied summary judgment with respect to the RICO Direct Payment Action, the RICO Investment Action, and the State Fraud Action. *See Falise v. American Tobacco Co.,* 91 F.Supp.2d 525 (E.D.N.Y.2000). Summary judgment was granted with respect to the RICO Settlement Action and the RICO Litigation Action. *Id.*

This memorandum and order justifies those rulings, and grants summary judgment with respect to the RICO Investment Action.

## II  FACTS

If plaintiffs allegations are true, this case represents the intersection of massive conspiracies to conceal the synergistic dangers of asbestos exposure and tobacco smoking from asbestos workers who were likely to be fatally affected by the combined inhalation of the two.

### A.  Asbestos
#### 1.  Uses and Production

Asbestos is a general term referring to two main varieties of natural, fibrous minerals, amphibole and serpentine. They were extensively used in a multitude of industrial and consumer products in the late-nineteenth century and throughout much of the twentieth century. Several properties distinguish asbestos from other minerals and explain its widespread and extensive use: its tensile strength, its heat and acid resistance, and its flexibility.

Asbestos lined partitions in schools, office buildings, hospitals and ships.... Other well-known uses of asbestos included: insulation around cold or hot air or liquid conductors or boilers, noise absorption in wall insulation and acoustic tile ceilings, covering of structural steelwork of large buildings to guard against fire and linings of brakes. Its dielectric properties resulted in many electrical equipment uses; it had such applications as ironing board covers, stove linings and table pads. Theatrical audiences were once comforted by the thought that huge asbestos curtains between the audience and stage protected against the spread of fire. Cement products constituted the single largest service for asbestos in the United States; asbestos-containing cement was utilized as filler in resins, plastics, grouts and even cosmetics. Asphalt surfaced roads occasionally contained asbestos fibers as well.

These wide-ranging applications plus ample and accessible supplies of asbestos account for its pervasiveness in many sectors of the American economy during the twentieth century.

*In re Joint Eastern and Southern District Asbestos Litigation,* 129 B.R. 710, 736 (E.D.N.Y.1991).

From the 1920s until the 1970s Johns–Manville was the largest manufacturer of asbestos-containing products and the largest supplier of asbestos in the United States. During its heyday, Manville marketed more than 500 different lines of products manufactured at the company's 33 plants and mines located throughout the United States and Canada. The company boasted in an article in Asbestos Magazine in 1970 that "Johns–Manville participates in almost every facet of the Asbestos Industry and is the largest supplier of asbestos in the United States."

#### 2.  Exposure

The massive and widespread use of asbestos in industrial, commercial and household contexts exposed millions to its insidi-

ous dangers. The primary groups at risk were those in the plants which produced asbestos products and those in the field laboring with or in close proximity to asbestos while it was cut and installed.

In the naval shipyards, for example, workers of all trades in small compartments breathed the heavy asbestos dust created by insulators and boilermakers and brought it home on their clothing [exposing their families to it]. Carpenters and metal workers who may not have worked directly with asbestos were nonetheless heavily exposed to its hazards. Workers in the oil fields of Texas, the tire factories of the mid-West and the shipyards of our coasts as well as in building construction in all parts of the country were at some degree of risk.

*Id.*

As a result of the greater awareness of dangers and new government regulations, use of asbestos generally ceased in the United States in the early 1970s. Because of the long latency of asbestos diseases, asbestos-related deaths will continue for decades to come. "Insidious asbestos is slowly working in the lungs of millions of workers and others." *Id.* at 737.

### 3. Health Hazards

Asbestos fibers cause injuries varying from fatal malignancies to mild scarring of the lung tissue. Four disease processes are associated with exposure: asbestosis, mesothelioma, cancers (including lung cancer), and pleural plaques.

Asbestosis refers to a pulmonary insufficiency caused by a destruction of air sacs in healthy lung tissue. It is progressive and incurable. The disease substantially impairs breathing capacity, dramatically reducing life expectancy. Evidence suggests that persons with asbestosis have an increased risk of contracting lung cancer and other malignancies.

Malignant mesothelioma is a rare neoplasm arising in the mesothelial cells that make up the pleural, pericardial and peritoneal membranes enclosing the lungs, heart and abdomen respectively. Though the disease may not develop for upwards of forty years from the period of exposure, once manifested it is often fatal within two years.

In addition to mesothelioma, other cancers such as pulmonary and bronchogenic malignancies are caused by asbestos exposure. Additional cancers traceable to asbestos may include those of the stomach, rectum, colon, larynx, pharynx and mouth.

Finally, asbestos exposure may cause pleural plaques, which is the thickening or calcification of the pleural tissue surrounding the lung.

These asbestos-associated diseases are progressive and incurable. They appear to correlate with duration and intensity of exposure to asbestos fibers.

The greater the exposure, the sooner the disease can be expected to appear; conversely, shorter or less intense exposure translates into a longer latency period. Occupational exposures that occurred in the 1940s, 1950s and 1960s are generally considered excessive with a relatively short latency period of fifteen to thirty years. In contrast, those environmentally exposed and exposed through household contacts may only manifest injury forty or more years later.

*Id.* at 741. Cessation of exposure will not halt or cure the disease.

### 4. Industry Coverup

In the early 1900s, medical and scientific research began to reveal convincing evidence of the health hazards associated with asbestos. "By 1935 asbestosis was 'widely recognized as a moral threat affecting a large faction of those who had regularly worked with the material.'" *Id.* at 738. In the late 1930s and throughout the 1940s, reports circulated revealing a strong association between asbestos and lung cancer.

Johns–Manville and other manufacturers of asbestos products ignored or attempted to conceal this information from the public. For example,

- In 1932, Johns–Manville sought to have material alterations made to a study of textile workers incidence of disease from asbestos. For instance, a sentence which stated " 'however, it is possible for uncomplicated asbestosis to result fatally' " was allegedly deleted from the published report. (*Id.* at 743).
- In 1936 Johns–Manville and others actively censored the information disseminated by the Saranac laboratories, preventing the Saranac scientists from promptly disclosing adverse scientific data.
- Johns–Manville sought to preclude publications in *Asbestos Magazine* of information concerning the hazards posed by asbestos dust.
- In 1933, resolving suits brought against the company by eleven employees alleging health injuries from exposure to asbestos, Johns–Manville explicitly conditioned settlements on plaintiffs' attorneys not bringing similar claims against the company in the future.

### 5. Litigation and Settlement

Beginning in the late–1970s, suits were brought by asbestos workers against John–Manville and other asbestos manufactures. By 1980, thousands of such suits were pending against Manville in both state and federal courts. The substantial bulk of these suits were brought by workers whose occupations involved direct exposure to or handling of asbestos or asbestos-containing products. A second large category of claims consisted of those who worked alongside such workers and consequently inhaled asbestos fibers.

Faced with a threatened avalanche of additional cases, Manville filed a petition for bankruptcy; further litigation was stayed. The negotiations and appeals during the bankruptcy proceedings took some six years. Finally, in November 1988, Manville's bankruptcy plan was confirmed.

As part of the plan, a Trust was established to provide compensation to the victims of asbestos-related injuries caused by Manville. The Trust is a New York grantor trust created to permit the fair, equitable and efficient evaluation, processing and satisfaction of claims against Manville, including claims for personal injury and wrongful death. The Trust's purpose is to "deliver fair, adequate and equitable compensation to claimants, whether known or unknown."

Manville's equity and assets, along with a substantial infusion of cash from insurance companies were sources of the Trust's corpus. Provided in the Plan were (1) a system of payment to current claimants on a first-in, first-out basis, according priority to pre-bankruptcy petition cases, and (2) payments to future claimants.

As it tried to litigate and settle claims, the Trust's assets were being consumed by huge transactional costs of some $1,000,000 a week, settlements at much higher values than predicted and a huge influx of claims, far beyond what had been projected. The Plan assumed that during the life of the Trust between 83,000 and 100,000 claims were likely to be filed and the Plan called for full payment to all Claimants based on that estimate. By 1991, the Trust had *already* received nearly double the predicted claims. As a result, the Trust was effectively insolvent almost as soon as it opened its doors.

To overcome the Trust's deficiencies, negotiations were conducted through a class action against the Trust to revise the payment plan. *See In re Joint Eastern and Southern District Asbestos Litig.*, 129 B.R. 710 (E.D.N.Y.1991), *vacated,* 982 F.2d 721 (2d Cir.1992), *mod. on rehearing,* 993 F.2d 7 (2d Cir.1993); *see also* 772 F.Supp. 1380 (E.D.N.Y.1991) (computation of damages); 769 F.Supp. 85 (E.D.N.Y.1991) (consolidation); 120 B.R. 648 (E. & S.D.N.Y.1990) (class certification); 123 B.R. 7 (E.D.N.Y. 1990) (joint administration); 134 F.R.D. 32 (E.D.N.Y.1990) (power over state cases); 737 F.Supp. 735 (1999) (special master ethics); 726 F.Supp. 426 (E.D.N.Y.1989) (computation of damages). After extensive

hearings and appeals—taking into account the needs of future claimants as well as fiscal realities—payments recommenced under a new plan ("TDP") in 1996.

Payments under the TDP were to be based on a matrix. In view of the limited remaining assets of the Trust and the projected number of claims, they were restricted to 10% of the value of claims fixed by the TDP.

In 1994, Congress passed a special law to ensure that the assets of the former asbestos corporations, including Johns–Manville, were not subject to claims after bankruptcy. *See* Bankruptcy Reform Act of 1994, Pub.L. 103–394, § 111(a), 108 Stat. 4106, 4113–4117 (codified at 11 U.S.C. § 524(g) & (h)). Present and future Claimants seeking recovery for delicts of Manville can look to only the Trust.

## B. Tobacco

The Trust, through its trustees, has now brought suit against Tobacco. The essence of the Trust's action is that its liabilities are substantially due to Tobacco's alleged misconduct in suppressing and concealing material information, and disseminating misinformation, about the unique health risks posed to those who both smoked and were occupationally exposed to asbestos. The trustees alleged:

For years, [Tobacco has] known that smoking, an activity indisputably dangerous to human health in and of itself, is even more lethal to individuals occupationally exposed to asbestos. With full knowledge of this deadly synergy [resulting from asbestos inhalation and tobacco use], and in anticipation of the assertion of claims against the tobacco industry arising therefrom, the defendants adopted a strategy aimed at shifting their synergy-related liabilities to the Trust and to similarly situated [asbestos] entities. The direct and proximate result of such conduct has been egregious harm to the Trust in the form of staggering liabilities, properly attributable to the defendants, arising from claims asserted against the Trust based on illnesses caused or exacerbated by cigarettes.

Am. Compl. ¶ 1.

### 1. Smoking

The dangers of smoking are now beyond dispute. The statistics are staggering. Smoking causes some 85% of all lung cancer in America. More than 80% of deaths from pulmonary diseases such as bronchitis and emphysema are traced to smoking. Smoking leads to tens of thousands of deaths annually from cardiovascular diseases such as strokes, heart attacks, and aortic aneurysms. Smoking can also lead to cancer of the kidneys, bladder, brain, and larynx.

Statistics from the Centers for Disease control indicate that annually, cigarette smoking leads to premature deaths of more than 400,000 Americans. *See* Am. Compl. ¶ 61. This figure exceeds the combined totals for deaths resulting from automobile accidents, AIDS, alcohol, illegal drugs, homicide, suicide, and fires.

Cigarettes contain hazardous levels of over 40 known chemical carcinogens. *See* Am. Compl. ¶ 62. These carcinogens are inhaled into the lungs of smokers, substantially contributing to "premature morbidity and mortality for most of those exposed." Am. Compl. ¶ 63.

Nicotine is the primary ingredient in cigarettes leading to continued use. It creates the "smoking high" smokers experience while progressively addicting them to cigarettes. It has been recognized as addictive by the Food and Drug Administration, the Surgeon General's Office, the World Health Organization and the American Medical Association.

Plaintiffs claim that cigarettes "have been designed and manufactured by the defendants to induce and/or enhance nicotine addiction, with the goal of ensuring lifetime self-administration of lethal doses of harmful substances." Am. Compl. ¶ 64. They identify the following specific acts by defendants to support their contention:

- Manipulation of nicotine levels;
- Control of pH-mediated nicotine impact;
- Specification of flavorants, additives and smoke chemistry and other physical characteristics to facilitate rapid and repeated product use; and
- Use of high-porosity paper, low-pressure drop filtration, rapid-burning tobacco and other physical characteristics to facilitate rapid and repeated product use.

*See* Am. Compl. ¶ 64.

### 2. Synergy

Substantial evidence exists that smoking sharply increases the risks and severity of asbestos-related diseases by working "synergistically" with asbestos. The combined effect of tobacco use and asbestos exposure on human health is far greater than the sum of their individual effects.

Various epidemiological studies appear to support this synergistic effect. "Epidemiological studies seek to identify the 'patterns of disease occurrence in populations and factors which influence those patterns.'" Nancy Lee Firak, *The Developing Policy Characteristics of Cause–In–Fact: Alternative Forms of Liability, Epidemiological Proof and Trans–Scientific Issues*, 63 Temp. L.Rev. 311, 328 (1990) (internal quotation marks omitted).

Research has revealed a statistically significant correlation between asbestos-diseases and combined exposure to asbestos and tobacco smoke. For example, Dr. Piero Mustacchi concluded in 1996 that the incidence of lung cancer from combined asbestos-smoking exposure was 53 times that normally occurring in unexposed populations, and over 10 times that occurring in non-smokers who were occupationally exposed to asbestos. *See* Piero Mustacchi, M.D., *Lung Cancer Latency and Asbestos Liability*, 17 J. Legal Med. 277, 280–97 (1996) (study conducted on 17,800 North American insulators and asbestos workers over a twenty-year period). The chart below details his conclusions; the magnitude of the correlation is reflected in the

"relative risk" factor, with a relative risk of one indicating there is generally no causal association.

Relative Risk of Disease From Smoking–Asbestos Synergy

| GROUP | RELATIVE RISK |
|---|---|
| Non-smokers/No occupational asbestos exposure | 1 |
| Non-smokers/Occupational asbestos exposure | 5 |
| Smokers/No occupational asbestos exposure | 11 |
| Smokers/Occupational asbestos exposure | 53 |

*See id.; see also* Berry Newhouse, M.C., & M. Turok, *Combined Effects of Asbestos Exposure and Smoking on Mortality from Lung Cancer in Factory Workers*, 2 Lancet 476, 478 (1972) (concluding that the synergistic relative risk from smoking and asbestos exposure was 50 times that occurring in unexposed populations).

In addition to this evidence indicating a synergistic effect between tobacco and asbestos causing lung cancer, plaintiffs purport to have scientific evidence indicating that a similar synergistic effect occurs for asbestosis and pleural plagues disease.

> Cigarette smoking not only is a substantial contributing factor to lung cancer in persons occupationally exposed to asbestos, but also increases the frequency of occurrence and severity of [asbestosis], the rate of progression and mortality from [asbestosis], and the frequency of occurrence of pleural abnormalities among workers exposed to asbestos.

Am. Compl. ¶ 45.

The increased financial burden allegedly borne by the Trust from smoking-asbestos synergy are enormous. According to plaintiffs, "[e]stimates indicate that at least 80% of all persons occupationally exposed to asbestos also smoked [and][a]lmost without exception, asbestos workers who did not smoke were exposed to secondhand smoke." Am. Compl. ¶ 43. Defendants' internal memorandum indicate that "by virtue of the demographics of the workforce, at least 80 and, in some case, 90

percent of the workers who were exposed to asbestos also smoked." *Id.*

### 3. Conspiracy

#### a. Synergy Knowledge

Plaintiffs contend that Tobacco has "long known and secretly admitted that smoking and occupational exposure to asbestos combine to form a lethal synergy." Am. Compl. ¶ 12. Based on internal company documents, Tobacco's knowledge appears to reach back to at least the 1960s. *See* Am. Compl. ¶ 46.

Plaintiffs rely on a number of internal memorandum, including a November 22, 1978 document drafted by Janet Brown, an attorney for American Tobacco, which acknowledges that "the risk of lung cancer in a non-smoking asbestos worker is elevated over that of a non-smoking non-asbestos worker but the risk of a smoking asbestos worker is enormously inflated over that of a non-smoking asbestos worker." Am. Compl. ¶ 46. A July 12, 1980 memorandum from Peter Lee, a former employee of the Tobacco Research Council, which was effectively supported and operated by all the defendants, stated:

> It is . . . difficult to doubt that the joint effect of smoking and asbestos on lung cancer death rates is synergistic . . . [T]he enormous lung cancer rates in asbestos workers who smoke are justification enough for the facts to be brough[t] forcefull to the attention of asbestos workers . . . . The health warning on the packet . . . may be [an] adequate safeguard to ensure the average smoker knows the problems he may face. Whether this is so for the asbestos worker is very much open to doubt. The tobacco industry should consider whether it might take further steps to ensure that the lethal smoking/asbestos combination is avoided.

Am. Compl. ¶ 47.

As further evidence, plaintiffs identify an August 7, 1968 Philip Morris memorandum from H. Wakeham suggesting a study be undertaken "to define in some manner those elements of the population who, *like asbestos workers,* are more likely to en-

counter serious risks by smoking and who, therefore, should be *discouraged from indulging in the habit."* Am. Compl. ¶ 46 (emphases added). A May 27, 1968 Philip Morris internal document noted:

> A number of experiments were conducted among workers who work in the asbestos factories. *Although asbestos also produces a gas detrimental to the lungs, it was found that the percentage of death among those who smoked was greater.* This supports the view that the lung must first be weakened by other factors before it can develop cancer.

Plfs' Counterstatement with Respect to Defs' Motion for Summary Judgment on All RICO Counts for Purported Lack of Direct Injury, 10 ("Plfs' Counterstatement on Direct Injury").

Rather than reveal the lethal nature of the smoking-asbestos synergy to asbestos workers and take steps to discourage them from smoking, Tobacco allegedly conspired to deceive and mislead them about the dangers in order to maintain their profits, to shield themselves from costly liability, and to shift those costs to the Trust and other asbestos-related entities. As evidence, plaintiffs identify a letter dated January 26, 1977 in which Arthur Furst advised that research revealing the development of carcinomas in the lungs of mice from the "combined effects of asbestos" and a carcinogen found in tobacco should not be published. Am. Compl. ¶ 49. Tobacco never revealed such potentially life-saving information to asbestos workers.

#### b. Synergy Coverup

In addition to failing to disclose the hazards of smoking-asbestos synergy, Tobacco allegedly took steps to affirmatively misrepresent and deny the dangers. A 1979 article published by the Tobacco Institute described synergy as a "confusing concept," and went on to claim that asbestos workers who *do not smoke* face an *increased* cancer risk. *See* Am. Compl. ¶ 50. A January 10, 1979 Tobacco Institute release entitled "Smoking & Health 1964–1979: The Continuing Controversy," criti-

cizes studies of smoking-asbestos synergy which conclude that smoking asbestos workers have increased risks of lung cancer; it states "[a]ny conclusion that it is the smoking which is responsible for the reported increased risk of lung cancer in the smoking asbestos worker is *not* justified on the basis of available evidence." *See* Plfs' Counterstatement on Direct Injury, at 12 (emphasis in original). "In its Position Statement on 'Smoking and Health—General Causation,' dated May 1, 1989, Reynolds stated that 'it has not been scientifically proven that there is an alleged synergistic interaction between asbestos and cigarette smoke.'" Am. Compl. ¶ 48. As late as 1997 defendants continued to deny a smoking-asbestos synergy according to plaintiffs. A 1997 RJR paper entitled "Is There Synergy Between Cigarette Smoke and Asbestos For Lung Cancer" concludes:

> The epidemiological data on cigarette smoking and occupational exposure to asbestos do not indicate a multiplicative interaction; the data can be interpreted as smoking 'protecting' the asbestos worker from occupational exposure.

Plfs' Counterstatement on Direct Injury, at 12.

Plaintiffs allege that not only did Tobacco publicly deny the smoking-asbestos synergy which they in fact knew to exist, but they "affirmatively targeted asbestos workers" in marketing their products. As support for this contention, plaintiffs point to evidence that defendants covertly assisted labor unions in judicially opposing a smoking ban instituted by Johns–Manville in its asbestos plants in the late 1970s. *See* Am. Compl. ¶ 52. Tobacco lawyers "secretly drafted the critical briefs result[ing] in the judicially mandated lifting of the smoking ban." *Id.*

### c. Broader Tobacco Conspiracy

Plaintiffs allege that the smoking-asbestos cover-up was part of a larger fraud, one that reached the whole of the American public and included manipulating nicotine levels in cigarettes to induce and sustain addiction, hiding from the public the addictive and lethal nature of cigarettes, creating the false aura of an "open controversy" on the health effects of smoking, targeting children through their advertising to increase sales, and preventing the development of a "safer cigarette."

They contend that Tobacco "understood early on that nicotine was the key to their continued success" because "smokers require a certain level of nicotine from their cigarettes and that ... 'satisfaction' is attributable to nicotine's effect on the body." Am. Compl. ¶ 25. As support, plaintiffs identify a memorandum authored by a Philip Morris official in 1978 which stated, "[i]f the industry's introduction of acceptable low-nicotine products does make it easier for dedicated smokers to quit, then the wisdom of the introduction is open to debate." Am. Compl. ¶ 81.

It is claimed that "[i]nstead of eliminating nicotine from cigarettes[,] ... [Tobacco] used their specialized knowledge of the addictive nature of nicotine in efforts to develop cigarettes which are more addictive[.]" Am. Compl. ¶ 83. For support, plaintiffs rely on evidence that "several manufacturers add ammonia compounds during the manufacturing process which increase[s] the delivery of nicotine." Am. Compl. ¶ 86. Plaintiffs cite to Brown & Williamson's "own internal documents [which] reveal that it and the other cigarette manufacturers sought to use ammonia compounds precisely for the purpose of increasing nicotine delivery." Am. Compl. ¶ 86.

Despite the reality, plaintiffs' allege, Tobacco continued to deny that it altered nicotine levels. As support, plaintiffs identify a 1994 RJR release entitled "We Do Not 'Spike' Our Cigarettes with Nicotine" and stating RJR does *not increase the level of nicotine in any of [its] products in order to 'addict' smokers.*" Plfs' Counterstatement on Direct Injury, at 15 & Ex. 34 (bold and underscore in original). As further support, plaintiffs point to a statement by the Vice President of the Tobacco

Institute on March 27, 1994 during a live, nationally televised news program:

> Bob Schieffer [News commentator]: Do you take the position—does the industry take the position that cigarettes are not addictive?
>
> Ms. Brennan Dawson [V.P., Tobacco Institute]: The industry does take that position.... [N]ot only do [the Tobacco companies] not add nicotine, but ... they don't manipulate nicotine. So Congress has been told formally by every cigarette manufacturer in the United States that [any contrary] claim is without foundation.
>
> ....
>
> Ms. Dawson: Nicotine is not added during the manufacturing process. It is that simple.

Plfs' Counterstatement on Direct Injury, at 15 & Ex. 35.

In addition to alleging defendants knowingly manipulated nicotine levels to foster addiction, plaintiffs allege that the Tobacco companies affirmatively sought to mislead the American public about nicotine's addictiveness. Here plaintiffs point to a 1963 Brown & Williamson internal document declaring: "[N]icotine is addictive. We are, then, in the business of selling nicotine, an addictive drug ...." Plfs' Counterstatement on Direct Injury, at 13. An April 14, 1972 RJR memorandum read:

> Paradoxically, the things which keep a confirmed smoker habituated and 'satisfied', i.e., nicotine and secondary physical and manipulative gratifications, are unknown and/or largely unexplained to the non-smoker .... We have deliberately played down the role of nicotine, hence the non-smoker has little or no knowledge of what satisfactions it may offer him, and no desire to try it.

Plfs' Counterstatement on Direct Injury, at 14.

An August 24, 1978 Brown & Williamson document states: "Very few consumers are aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison.... Consumers attitudes toward nicotine will not change too greatly in the near future." Plfs' Counterstatement on Direct Injury, at 15 & Ex. 32. At least as late as 1994 the Tobacco companies were continuing to deny the addictiveness of nicotine. For example, turning again to the national interview of the Vice President of the Tobacco Institute:

> Mr. Schieffer: Why is the tobacco industry the only group that says nicotine is ... or cigarettes are not addictive?
>
> Ms. Dawson: Well, it's not the only group of people who say that nicotine is not addictive. If you look at the definition of addiction—there are two different ones. We talk about people being 'news junkies,' we talk about 'chocaholics,' we talk about people being 'hooked on exercise.' That's a very loose, jargony word that—that we've all somehow seemed to have adopted into our lexicon. Then there's a classical definition of addiction, which talks about withdrawal symptoms that put you in the hospital; it talks about intoxication; it talks about ruining your lifestyle .... None of those things fit nicotine or smoking.

Plfs' Counterstatement on Direct Injury, at Ex. 35.

Other efforts allegedly undertaken by Tobacco to hide nicotine's addictiveness include:

- Tobacco hired Dr. Gary Huber, a Harvard University researcher, to perform biological research on nicotine. "When it became clear that Dr. Huber's research supported the concept that nicotine was a dependence-producing substance," he was informed by industry lawyers "that he was 'getting too close to some things'" and his financial support was ultimately withdrawn, terminating his research. (Am.Compl.¶ 114);

- Philip Morris hired Dr. Victor DeNoble in 1980 to study the effects of nicotine on the behavior of rats. When Dr. DeNoble discovered that nicotine met two of the hallmarks of addiction, Philip Morris instructed him to keep his research secret, even from

other Philip Morris scientists. In 1983, Philip Morris went so far as to order him to withdraw from publication a research paper on nicotine's addictive properties even though the paper had already been accepted for publication. (Am.Compl.¶ 116);

- A 1963 [internal] report, entitled "The Fate of Nicotine in the Body," states that nicotine "appears to be intimately connected with the phenomena of tobacco habituation [tolerance] and/or addiction." (Am.Compl.¶ 122(G)).

Plaintiffs also allege that the Tobacco companies conspired to create a "false aura of an 'open controversy' [about the dangers of smoking] despite their internal admissions" to the contrary. Plfs' Counterstatement on Direct Injury, at 7. Plaintiffs contend the coverup was accomplished by "hiding and ... destroying internally sponsored scientific research on the hazards of smoking," Am. Compl. ¶ 108, "by squelching the dissemination of such information by others," *id.*, and by distorting "the truth concerning the ... disease-causing effects of cigarette smoke to those persons who are exposed," Am. Compl. ¶ 127. To support these contentions, plaintiffs identify the following:

- In 1971, Tobacco, with the assistance of legal counsel, allegedly engineered and partially carried out a plan to "embarrass" E. Cuyler Hammond, the chief epidemiologist at the Department of Epidemiology and Statistics at the American Cancer Society and later coauthor of the 1979 paper on "Asbestos exposure, cigarette smoking and death rates." (Am.Compl.¶ 49);
- A 1970 Tobacco Institute advertisement stated: "After millions of dollars and over 20 years of research: The question about smoking and health is still a question." (Plfs' Counterstatement on Direct Injury, at 8);
- A May 1, 1972 memorandum from Fred Panzer stated: "for nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts—litigation, politics,

and public opinion.... [It has] consist[ed] of creating doubt about the health charge without actually denying it, advocating the public's right to smoke, without actually urging them to take up the practice." (Plfs' Counterstatement on Direct Injury, at 8–9);

- Dr. Freddy Homburger, a Cambridge, MA researcher, undertook a study of smoke exposure on hamsters pursuant to a CTR grant. His grant was changed mid-study so CTR could control publication. Upon completion of his study in 1974, Dr. Homburger was allegedly told by CTR officials that the CTR "didn't want [him] to call anything cancer" and that Dr. Homburger would "never get a penny more" if his paper was published without deleting the word "cancer." (Am.Compl.¶ 113);
- In January 1979, the Tobacco Institute allegedly issued a false press release stating that defendants had spent 75 million dollars on research over 20 years to learn whether smoking is harmful but that "the case against cigarettes is not satisfactorily demonstrated." (Am.Compl.¶ 135);
- RJR advertised in the New York Times in 1984 that "[s]tudies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary." (Am. Compl.¶ 137);
- During an October 1983 airing of the television newscast *20/20*, Ann Browder of the Tobacco Institute stated in response to a question about the health hazards of tobacco that "the case is still open. The jury has not come in." When asked if cigarettes were harmful, Browder stated "[i]t may be or it may not be. We don't know." (Am.Compl.¶ 136);
- In 1983, Sheldon Sommer, MD, scientific director of the CTR, testified before Congress: "Cigarette smoking has not been scientifically established to be a cause of chronic diseases, such as cancer, cardiovascular disease, or

emphysema. Nor has it been shown to affect pregnancy outcome adversely." (Am.Compl.¶ 145).

To effectuate the massive fraudulent scheme perpetrated on the American public, the Tobacco companies are alleged to have intentionally marketed cigarettes to children—many of whom would invariably go on to work with or near asbestos products—in an effort to ensure future market demand for their product. As support for this contention, plaintiffs identify a June 1973 Philip Morris document entitled "Tobacco Marketing" which refers to children ages 15 to 19 as "the primary source of new smokers" and notes that children ages 12 to 17 have a "smoking incidence" rate of 18%. Plfs' Counterstatement on Direct Injury, at 13.

As a final prong of the scheme, defendants are alleged to have conspired to prevent the development and marketing of a "safer cigarette." Plaintiffs contend that the Tobacco companies "were successful in discovering which specific constituents were carcinogens, and which were linked to other diseases, but kept the research secret and never reported it to the public." Am. Compl. ¶ 72. Furthermore, both RJR and Liggett are alleged to have actually developed safer cigarettes. At least in the case of Liggetts, the safer cigarettes were not marketed because Liggett management "felt that such a cigarette if put on the market would seriously indict them for having sold other types of cigarettes that" weren't as safe. Am. Compl. ¶ 75. As it contemplated marketing the safer cigarette Liggett was allegedly "warned by a Philip Morris representative that, if [it] tried to market the 'safer' cigarette in the United States, Philip Morris would do everything in its power to try to stop it." Am. Compl. ¶ 75.

Plaintiffs also allege that the Tobacco companies agreed in a "Gentleman's Agreement" that none of them would perform research on smoking, health, and the development of "safer cigarettes," and that any such information then existing would be concealed. Am. Compl. ¶ 97.

d. Tobacco's Enterprises

Plaintiffs contend that Tobacco's fraudulent scheme to hide the dangers of smoking from the American people generally, and asbestos-workers particularly, grew out of a December 15, 1953 hotel meeting of the chief executive officers of Philip Morris, RJR, Lorillard, and Brown & Williamson. See Am. Compl. ¶ 92. As a result of that meeting, a joint research organization, The Tobacco Institute Research Committee (TIRC) was created. In full-page newspaper advertisement on January 4, 1954—which ran in 448 newspapers in 258 cities and was entitled "A Frank Statement to Cigarette Smokers"—defendants stated that the TIRC would conduct and report objective and unbiased research regarding smoking and health. See Am. Compl. ¶ 92–94.

In 1958 a second trade group, the Tobacco Institute, was formed as a lobbying group by the defendant manufacturers. In 1964 the TIRC changed its name to the Council for Tobacco Research–USA, Inc. (CTR) when Liggett joined.

Plaintiffs contend that the TIRC, and later the CTR, along with the Tobacco Institute, were pivotal in Tobacco's fraudulent scheme of misinformation regarding the heightened dangers of smoking-asbestos synergy and the general hazards of smoking. They allege that the research efforts undertaken through these entities "were neither disinterested nor objective," but were "designed and employed to promote research favorable to defendants' continued sales of their tobacco products, to suppress negative research where possible, and to attack negative research when it could not be suppressed—all in order to convince the public . . . that there is no proof linking cigarette smoking to disease in humans." Am. Compl. ¶ 99. As support for this allegation, plaintiffs point to a 1978 memorandum from a Philip Morris official characterizing CTR as "an industry shield" and referring to "the public relations value of CTR" and the importance of "the industry continu[ing] to spend . . .

dollars on research to show that [it does not] agree that the case against smoking is closed." Am. Compl. ¶ 101.

Plaintiffs also allege that BAT, Brown & Williamson, and other BAT tobacco subsidiaries formed a research group called the BAT Research Group "for the purposes of pooling research efforts and providing BAT with scientific data regarding the health effects of smoking and the addictive nature of nicotine" "provid[ing] BAT and B & W with advice on designing cigarettes to maximize their addictive nature," and "assist[ing] BAT and B & W in developing and disseminating pro-smoking propaganda." Am. Compl. ¶ 106. The BAT Research Group allegedly worked with the TIRC (and later the CTR) and the Tobacco Institute to further Tobacco's campaign of misinformation to asbestos workers and the population at large.

In 1988, the CTR and the Tobacco Institute "were placed in receivership by a New York court based on evidence that they were 'propaganda arms' of the tobacco industry." Am. Compl. ¶ 104. Both have since been shut down.

## III SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to "set forth specific facts showing that there

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud shall be stated with particularity.").

All inferences are to be drawn from the underlying facts in the light most favorable to the party opposing the summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The mere existence of some peripheral factual disputes will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505.

## IV SECTION 1962(c)-RELATED CLAIMS

### A. Causation

#### 1. Factual Causation: Reliance

■ To recover under civil RICO, a plaintiff must establish an injury to his business or property "by reason of" the alleged racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[A] plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation.*" (emphasis added)); *Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 516 (2d Cir.1984), *vacated and remanded on other grounds*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), *on remand*, 859 F.2d 1096 (2d Cir.1988) ("the requirement that the injury be 'by reason of' a violation of § 1962 means that there must be a causal connection between the prohibited conduct and the plaintiff's proprietary injury. Thus, it

is insufficient for a plaintiff to prove simply a violation by the defendants and a proprietary injury; it must prove that the defendant's violation *caused the injury.*" (emphasis added)); Douglas E. Abrams, *The Law of Civil RICO* § 3.3.1, at 138 (1991) ("[S]ection 1964(c)'s 'by reason of' language requires proof that the violation caused the plaintiff's proprietary injury.").

■ At a minimum, the injury must have been caused in fact by the racketeering activity. *See generally* Dan B. Dobbs, *The Law of Torts* § 166 (cause in fact requirement). It must have been a *"substantial factor in the sequence of responsible causation"* leading to the injury at issue. *County of Suffolk v. LILCO*, 907 F.2d 1295, 1314 (2d Cir.1990) (emphasis added) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990)).

■ When, as here, mail fraud and wire fraud are the alleged predicate acts forming the racketeering activity, justified reliance on the fraud is necessary to establish causation in fact. *See, e.g., Appletree Square I v. W.R. Grace & Co.*, 29 F.3d 1283, 1286 (8th Cir.1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts."); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) ("to establish the required causal connection, the plaintiff [must] ... demonstrate that the defendant's misrepresentations were relied on."); *Grantham and Mann v. American Safety Products*, 831 F.2d 596, 606 (6th Cir.1987) (failure to establish detrimental reliance); *In re Sumitomo Copper Litigation*, 995 F.Supp. 451, 458 (S.D.N.Y.1998) ("When the predicate acts of mail and/or fraud are alleged, 'to establish the required causal connection, the plaintiff [is] required to demonstrate that the defendant's misrepresentations were relied on.'"); *see also THC Holdings Corp. v. Tishman, TMCL Corp.*, Civ. No. 93–5393, 1996 WL 291881, at * 4 (S.D.N.Y. May 31, 1996) ("Although detrimental reliance is

not an element of mail or wire fraud claims generally, a plaintiff seeking to base RICO liability on these predicate acts must prove that its injuries are the result of reliance on the fraud."); Arthur F. Mathews, Andrew B. Weissman, & John H. Sturc, 2 *Civil RICO Litigation* § 8.04[B][1], at 8–44 (2d ed.1992) [hereinafter *Civil RICO Litigation* ] ("[S]ection 1962(c) almost certainly requires proof of reliance because in a fraud-based case, *reliance is an essential aspect of showing that the injury suffered was caused by the fraud.*" (emphasis added)); *id.* at 8–45 ("[T]he concept of reliance enters the picture in civil RICO because of its relationship to the injury causation requirement, not as an element required to prove the predicate acts.").

■ A RICO plaintiff may establish reliance sufficient to prove injury causation deriving from the predicate acts of mail or wire fraud in one of two ways. *See Sterling Interiors Group, Inc. v. Haworth, Inc.*, Civ. No. 94–9216, 1996 WL 537482, at * 4 (S.D.N.Y. Sept.23, 1996). First, a plaintiff may "claim that he was the direct target of the fraudulent scheme. In that case, to plead causation, [the] plaintiff would have to allege that he himself relied on the underlying misrepresentations to his detriment." *Id.* Plaintiffs RICO Settlement Action and RICO Litigation Action fall into this category.

As a second possibility, a plaintiff may allege that "his injuries were indirectly but proximately caused by a fraudulent scheme directed at third parties, that is to say, the third parties' reliance on the underlying misrepresentations." *Id.* at *4; *see County of Suffolk*, 907 F.2d at 1311 (third-party reliance); 2 *Civil RICO Litigation* § 8.04[B][1][a], at 8–49 ("[I]f the defendant's misrepresentations cause a third party to take actions causing plaintiff's injury, the factual causation link is satisfied. Whether such injury should nevertheless be deemed too remote to permit recovery under [civil RICO] is a matter of proximate causation analysis, not

causation-in-fact."). Plaintiffs' RICO Direct Payment Action satisfies this category.

### a. Reliance Showing

Defendants seek dismissal of plaintiffs RICO Settlement and Litigation Actions contending that plaintiffs have failed to identify a specific misrepresentation relied upon by the Trust in settling claims or in failing to implead Tobacco in the asbestos-worker suits. *See* Defs' Mot. for Summ. Judgment for Lack of Direct Injury, at 25 [hereinafter "Direct Injury Motion"] ("[T]he Trust cannot identify a single public statement made by the defendants on any topic that the Trust knew about and relied on at any time in its operations."). Defendants similarly seek dismissal of the RICO Direct Payment action asserting that the Trust cannot identify specifically what if any misrepresentations each Claimant relied on in continuing to smoke. Defendants argue these failures are fatal to each claim.

■ Though reliance is a requirement for establishing causation where predicate acts based in fraud are alleged, the nature of the reliance is not a constant. Where the fraudulent scheme is limited in scope and specifically targeted at only one or a few individuals, organizations, or entities, the establishment of causation should require reliance on identifiable misrepresentations. *See, e.g., County of Suffolk,* 907 F.2d at 1311 ("*In the context of this case,* which involves RICO mail fraud claims, this means that it is necessary for Suffolk to demonstrate at trial that *LILCO's misrepresentations to the PSC were relied upon by the PSC.*" (emphases added)); *see also Metromedia,* 983 F.2d at 357 (misrepresentations sent by mail directly to targeted victim).

Where, however, the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individual-

ly mislead millions of people. From the perspective of the fraudulent actors, clear efficiencies are gained by co-opting the media and other outlets of information as unwitting tools for the pervasive scheme.

If plaintiffs allegations are borne out, it was crucial to the success of Tobacco's scheme—particularly the public's willingness to accept the misrepresentations—that "big lies" about smoking-asbestos synergy, nicotine's addictiveness, and the inability to produce a safe cigarette appear to come not from the Tobacco entities themselves, but rather to appear as facts—or at least open questions—permeating the entire body of public knowledge. To require reliance on specific misrepresentations where indirect channels of communication were integral to the success of the scheme would produce the perverse result of having the most massive and sinister fraudulent schemes be the ones that must escape civil-RICO liability.

Where such a broad-based fraudulent scheme is alleged, a plaintiff in order to establish reliance for injury causation need only establish (1) that the RICO defendants intentionally engaged in a scheme to distort the body of public knowledge, (2) that the defendants were successful in doing so (e.g., a substantial factor causing the distortion), (3) that there was detrimental reliance on this distorted knowledge by an intended and foreseeable class of victims, (4) that such reliance was reasonable in the totality of the circumstances, and (5) that the plaintiff was proximately injured by this reliance.

### b. Application to RICO Settlement and Litigation Actions

■ Plaintiffs have pled with sufficient particularity allegations that, if proven true, would satisfy the first two requirements for reliance, namely that Tobacco intentionally engaged in a scheme to distort public knowledge about synergy and the dangers of cigarettes in general, and that Tobacco was successful in effectuating the nefarious silence.

With respect to the RICO Settlement and Litigation Actions, plaintiffs have not pled with sufficient particularity facts that would establish that the Trust either detrimentally relied on the distorted body of public knowledge or that, even assuming it did rely, such reliance was reasonable under the totality of the circumstances.

The answers to interrogatories and depositions on behalf of the Trust belie any evidence of detrimental reliance in not impleading Tobacco or in establishing settlement values in the asbestos worker suits. For example, the plaintiffs admit that "perhaps" as early as May 1988, when the Trust began to negotiate claims, the Trust was aware of scientific studies concluding that there was a synergistic effect between tobacco and asbestos. *See* Plfs' Resp. to Defs' First Set of Requests to Admit, [hereinafter "Defs' First Requests"] Request # 34. Plaintiffs also admit that "[i]f you had synergy, you're going to have more claims and more severe claims [than if claimants had not smoked] . . . and the trust knew that in 1988." Austern Dep. 1/26/00.

Plaintiffs have admitted that there is nothing new they have learned about smoking-asbestos synergy that the Trust did not know in 1988:

> *Q.* I take it from what you're saying that there was nothing new that the trust learned about smoking or the relationship of smoking to asbestos claims that prompted the filing of the lawsuit?
>
> *A.* The relationship of smoking to asbestos claims?
>
> *Q.* Right. That prompted the filing of the lawsuit. There's nothing new—
>
> *A.* Not medically.
>
> *Q.* Medically, scientifically, any other kind of way. There's nothing specifically that the trust had learned that was new about smoking or the relationship of smoking to asbestos . . . claims that prompted the filing of the lawsuit, correct?

> *A.* I think that's correct.

Austern Dep. 9/24/99.

The Trust openly admits that it was not a lack of understanding about synergy—brought about by Tobacco's national campaign of misinformation—that caused the Trust not to implead Tobacco, but rather a concern that it could not win in litigation against Tobacco. As David Austern, counsel for the Trust since its inception, testified:

> The operational decision not to sue [Tobacco] . . . was a decision that I made in 1988 and in 1989 on the grounds that it was imprudent to use trust funds to bring a case where you could not find the documents to prove the case and the only way you could prove the case was to spend money in search of the documents.

Austern Dep. 9/26/99 at 213. The trustees simply applied a cost-benefit analysis—likely one mandated by their fiduciary duties to preserve the corpus of the Trust—in deciding not to implead Tobacco.

Plaintiffs thus far have failed to produce evidence that Tobacco's scheme caused the Trust to "undervalue" Tobacco's share of the Claimants' injuries in settling suits. They have admitted that the Trust, "perhaps" as early as May 1988, was aware of "the 1985 Surgeon General Report indicat[ing] that the risk of lung cancer among asbestos workers was five times higher than that for workers in other industries, that said risk is 50 times higher if the asbestos worker smokes and 87 times higher if he or she smokes more than one pack of cigarettes per day." Plaintiffs have not alleged that these relative risk calculations were wrong, and rely on these very calculations in their statistical supporting damages.

The trustees also admit that "nothing in the documents or testimony provided by the tobacco companies since 1988 has altered the Trust's quantification of the relative risks attributable to smoking and as-

bestos." Defs' First Requests, Request # 36.

Against the force of this evidence—suggesting the Trust was not misled about Tobacco's share of liability for Claimants' injuries—plaintiffs have thus far failed to produce evidence that would allow a reasonable fact finder to conclude that the Trust, either in deciding not to implead Tobacco or in establishing settlement values for claims—relied on misleading information generated by Tobacco. The Trust appears to have known in 1988 that Tobacco was liable for a share of the injuries and it appears to have had a reasonably accurate estimate of Tobacco's liability. This being the case, it cannot now be established on the present evidence that the Trust detrimentally relied on misinformation generated by the Tobacco industry when the Trust decided not to litigate against Tobacco or when the Trust established settlement values.

Even assuming for arguments sake that the Trust did rely on Tobacco's alleged campaign of misinformation in deciding not to litigate or in establishing settlement values, such reliance arguably would not have been reasonable under the totality of the circumstances. *See* W. Page Keeton, *Prosser and Keeton on Torts* § 108, at 749 (5th ed. 1984) ("Not only must there be reliance but the reliance must be justifiable under the circumstances." (footnote omitted)); *Civil RICO Litigation* § 8.04[B][1], at 8–48 ("[T]he reliance requirement is met only if the reliance was reasonable.").

The Trust was a sophisticated entity, employing large corps of attorneys and doctors; it had a unique interest in discovering the real share of both its liability and Tobacco's contributing liability. To conclude on the present evidence that it would have been reasonable for the Trust to have, at a minimum, known of the studies existing in 1988 suggesting a smoking-asbestos synergy, but to have blindly relied on Tobacco denials, would effectively eviscerate the "reasonableness" requirement of reliance.

In short, plaintiffs have failed to establish sufficient evidence of reliance by the Trust to allow the RICO Settlement and the RICO Litigation theories to go to the jury. Even if amendments and further discovery might prove sufficient reliance, and perhaps even reasonable reliance, these theories are too difficult to try as a practical matter, since they would require the jury to understand the nuances of complex contribution tort law and tactics in all fifty states. There is no need to so burden the litigation system since the RICO Direct Action suffices for plaintiffs' case.

Summary judgment is granted on the RICO Settlement and Litigation claims.

### c. Application to RICO Direct. Payment Action

■ With respect to the RICO Direct Payment Action, the plaintiffs have made a sufficient showing of detrimental reliance on Tobacco's campaign of misinformation by the Trust's Claimants who smoked, that such reliance was reasonable in the totality of the circumstances, and that, as discussed in the next section, the Trust was proximately injured by this reliance. Moreover, this theory is sufficiently straight-forward to permit a jury to evaluate it.

Plaintiffs' statistical model, prepared by Dr. Jeffrey Harris, MD, PhD., arguably sufficiently reveals (subject to a *Daubert* hearing) that Trust Claimants, as a group, smoked longer as a result of reliance on Tobacco's conduct, particularly its intentional failure to disclose knowledge of the smoking-asbestos synergy. *See* Plfs' Reply Mem. of Law in Resp. to Court's Request for Briefing with Respect to Plfs' Leg. Theories, Ex. 1 at 12–37 [hereinafter "Harris Model: Results and Conclusions"]. For example, to gauge the effect of Tobacco's conduct on smoking Claimants' quit rate, a comparison is made between the quit rates of past and present Claimants—who were not warned of the smoking-asbestos synergy—with the quit rates of a group of asbestos insulation workers ("Insulation Group") who "received accurate,

timely and repeated messages, from the early to mid 1960s onward, that smoking and asbestos were a particularly deleterious mix." Harris Model: Results and Conclusions, at 15. After controlling for relevant variables such as age, Dr. Harris concludes that "the quit rates of smoking claimants to the Trust would [have been] at least 2.4 times greater than those actually observed" *but for* Tobacco's fraudulent omissions and misrepresentations, and asbestos-workers' reliance thereon. Harris Model: Results and Conclusions, at 19.

This comparison and similar ones undertaken by Dr. Harris with respect to smoking initiation rates sufficiently establish for summary judgment purposes that the Trust's smoking Claimants relied on Tobacco's conduct and omissions in continuing to smoke. *See* Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329, 339–45 (statistical methods in proving causation); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 782–87 (use of statistical sample of class claims in determining compensatory damages did not violate due process clause since adversarial resolution of each class member's claim would pose insurmountable practical hurdles). Whether such reliance by the Trust's Claimants was reasonable in the totality of the circumstances—particularly given the lack of sophistication on such health matters of many, if not most, of the Claimants, when combined with the allegedly voluminous distortions and omissions by Tobacco concerning the dangers of smoking-asbestos synergy and smoking generally—is not amendable to resolution by the court on a motion for summary judgment.

Finally, plaintiffs have proffered sufficient evidence to withstand a summary judgment motion that the Trust was injured by the Claimant's reliance on Tobacco's conduct. Through Dr. Harris's model, plaintiffs may establish that the lower quit rates and the higher initiation rates of Trust Claimants brought about by Tobacco's conduct has resulted in higher rates of compensable diseases for which the Trust is obligated to pay. *See* Harris Model:

Results and Conclusion, at 11, 37–52. For example, among the Insulator Group, Dr. Harris's statistical study indicates that:

> continuing smokers had a mortality rate from lung cancer that was 21.8. The relative [risk] of insulators who quit 1–9 [years prior to 1981] was 13.5. Those who quit 10–19 years earlier had a reduced relative risk of 6.7; while those who quit 20–29 years earlier had a further reduced relative risk of 4.0.

Harris Model: Results and Conclusions, at 42. Dr. Harris uses these and similar comparisons for other disease categories to project reduced Claimant injuries, and in turn reduced Trust liabilities for those injuries.

This evidence is sufficient to withstand Tobacco's motion for summary judgment for reliance and factual causation with respect to the RICO Direct Payment Action.

### 2. Proximate Causation: Remoteness

#### a. Incorporation of Proximate Causation into Civil RICO

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court incorporated a remoteness inquiry as an element of proximate causation under civil RICO. The Court reached this conclusion by noting that Congress, when it passed civil RICO in 1970, modeled it on the "civil-action provision of the federal antitrust laws, § 4 of the Clayton Act," which reads in relevant part:

> any person who shall be injured in his business or property *by reason of* anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, including a reasonable attorney's fee.

15 U.S.C. § 15. Because section 4 of the Clayton Act, passed in 1914, itself borrowed language from section 7 of the Sherman Act, which had been read at the time by lower federal courts to incorporate common-law principles of proximate causation, the Court reasoned that Congress had intended section 4 to incorporate com-

mon-law principles of proximate causation as well. *See Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 530–31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("The repeated references to the common law in the debates that preceded the enactment of the Sherman Act make it clear that Congress intended the Act to be construed in the light of its common-law background.... Thus our comments on the need for judicial interpretation of [section 7 of the Sherman Act] are equally applicable to [section 4 of the Clayton Act].").

In *Holmes,* the Court reasoned by extension that the same conclusion applies to the RICO Act's section 1964(c). *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311.

> We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them. Proximate cause is thus required.

*Id.* (internal citations omitted). *But see* Douglas E. Abrams, *The Law of Civil RICO* § 1.4, at 24–30 (1991), American Bar Association's Antitrust Section had warned that " 'the use of the antitrust laws themselves as a vehicle for combating organized crime could create inappropriate and unnecessary obstacles in the way of persons injury ... who might seek treble damage recovery," including " 'a body of precedent ... setting strict requirements on questions such as ... proximate cause.' " (quoting 115 Cong. Rec. 6995 (1969)).

### b. *Holmes*

*Holmes* itself involved a suit under civil RICO by the Securities Investor Protection Corporation (SIPC) accusing some 75 defendants of instituting and carrying out a fraudulent scheme which led to the financial collapse of First State Securities Corporation (FSSC) and Sebag, Inc., securities broker-dealers and SIPC members.

The SIPC was a statutorily authorized, private non-profit corporation of which most securities broker-dealers registered under section 15(b) of the Securities Exchange Act of 1935 were required to be members. Whenever a member broker-dealer failed financially and its pooled funds were inadequate to cover customers' claims, the SIPC was obligated to "advance up to $500,000 per customer ... for use in satisfying those claims." *Id.* at 262, 112 S.Ct. 1311.

The SIPC brought an action in subrogation under RICO on behalf of the nonpurchasing customers of FSSC and Sebag (those who had not purchased the fraudulent stock in question) alleging that:

> the defendants manipulated stock of six companies by making unduly optimistic statements about their prospects and by continually selling small numbers of shares to create the appearance of a liquid market; that the broker-dealers bought substantial amounts of stock with their own funds; that the market's [eventual] perception of the fraud ... sent the stocks plummeting; and that this decline caused [FSSC and Sebag's] financial difficulties resulting in their eventual liquidation and SIPC's advance of nearly $13 million to cover their customers claims.

*Id.* at 262–63, 112 S.Ct. 1311. The Court summed up the injury as follows: "The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors." *Id.* at 271, 112 S.Ct. 1311.

After beginning its analysis with the often quoted 80 years old observation of Justice Holmes that " '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step,' " *see id.* at 271–72, 112 S.Ct. 1311 (citations omitted), the Court announced a "direct-injury" test that limits recovery under section 1964(c). By the Court's use of the term "direct" in referring to the test is not

a measure of proximity in any physical sense, but rather "should merely be understood as a reference to the proximate-cause inquiry that is informed by" the three policy factors making up the test. *Id.* at 273 n. 20, 112 S.Ct. 1311 (" '[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case.' ").

The first policy factor is whether there are independent forces, resulting from the indirectness of the injury, that complicate the "ascertain[ment of] the amount of a plaintiff's damages attributable to the violation." *Id.* at 269, 112 S.Ct. 1311 (quoting *Associated General Contractors,* 459 U.S. at 540, 103 S.Ct. 897). The second factor is whether recognizing the claims of the less directly injured party would have the effect of "forc[ing] courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the · risk of multiple recoveries." *Id.* at 269, 103 S.Ct. 897. And the third is whether "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70, 103 S.Ct. 897.

Applying the remoteness inquiry in *Holmes,* the Supreme Court concluded that the defendants' "conduct did not proximately cause the nonpurchasing customers' injury" and the SIPC could therefore not sue on their behalf in subrogation. *Id.* 112 S.Ct. at 1319. With respect to the potential for independent factors to have caused the injury due to remoteness, the Court argued "[i]f the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices· or their failures to anticipate developments in the financial markets." *Id.* at 272–73, 112 S.Ct. 1311. In addressing the second factor—the poten-

tial for multiple recovery—the Court reasoned if the suit were allowed the district court would then be forced "to apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages." *Id.* at 273, 112 S.Ct. 1311. And with respect to the final factor—whether more directly injured victims can be expected to vindicate the law—the Court concluded that the broker-dealers themselves would be better suited to do so, particularly given that a suit on behalf of the nonpurchasing customers in the context of the underlying bankruptcy action "could be an attempt to circumvent the relative priority [their] claims would have in the [broker-dealers'] liquidation proceedings." *Id.* at 273–73, 112 S.Ct. 1311.

### c. *Laborers Local 17*

In *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2d Cir.1999), the court of appeals for the Second Circuit applied the *Holmes* remoteness inquiry to determine whether a labor union health and welfare trust fund was proximately injured by conduct similar to that alleged in this case.

The essence of the claim in *Laborers Local 17* was that:

the defendant tobacco companies engaged in an advertising campaign designed to mislead the public, and plaintiffs specifically, as to the true extent of the dangers that smoking poses to good health. Defendants actively concealed information that would have demonstrated the actual health risk, the addictiveness of nicotine, the effectiveness of various treatments for smoking addiction, and defendants' own ability to manufacture less addictive products. Moreover, plaintiffs and plan participants had no knowledge—until very recently—of defendants' wrongdoing. As a result, thousands of participants in plaintiffs' health care Funds became ill and/or died from smoking cigarettes produced and sold by defendant tobacco companies.

*Id.* at 232–33. Plaintiffs went on to claim the defendants' misrepresentations caused the "Funds to fail to implement smoking cessation programs" which would have reduced the incidence of smoking-related diseases suffered by plan-participants, and thus the costs the Funds would have to pay for such diseases. *Id.* at 239.

In beginning its analysis, the court makes the poignant, but unnecessarily self-effacing observation that "[a]ny discussion of proximate cause should be approached with some trepidation [as] ... no topic is subject to more disagreement or such confusion." *Laborers Local 17,* 191 F.3d at 235. The court of appeals, quoting the Supreme Court, stated that "the infinite variety of claims that may arise make it virtually impossible to announce a blackletter rule that will dictate the result in every case." *Id.* at 239 n. 4.

It limited its ruling specifically to Laborers Local 17's claims, stating unambiguously that "to the extent [its] description of 'indirect' or 'derivative' injury [in determining proximate causation] might seem to encompass cases where recovery by the plaintiff *would not run afoul of the policy concerns* [in the *Holmes* remoteness inquiry], *the outer limits of the direct injury test are described more by those concerns than by any bright-line, verbal definition." Id.* (emphasis added). *But see* Note, *Statutory Interpretation—Second Circuit Holds that Health Care Funds Lack Standing to Sue Tobacco Companies Under RICO—Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2d Cir.1999) ("The court's reliance on an overly mechanical test of proximate cause led it to ignore the policies underlying the RICO predicate offenses of fraud. As a result, the court inappropriately dismissed the funds' claims.").

Applying the *Holmes* factors, the court concluded that "the funds have failed to establish proximate causation." *Laborers Local 17,* 191 F.3d at 241. Given the superficial appearance of factual similarity of *Laborers Local 17* and the case at hand, a close inquiry of the court's reasoning and application of the *Holmes* factors is warranted. With respect to the first factor—the difficulty of ascertaining defendants' liability as distinct from other independent factors due to the remoteness of the injury—the court reasoned the chain of causation under plaintiffs' theory of the case was complicated by the "intervening agency of" the smokers, which counseled against a finding of proximate causation on this factor. *Id.* at 240. Specifically, the court identified three intervening forces at work under plaintiffs' theory of the case which would have made it difficult "for plaintiffs to prove [liability] with any certainty":

> (1) the effect of any smoking cessation programs or incentives would have had on the number of smokers among the plan beneficiaries; (2) the countereffect that the tobacco companies' direct fraud would have had on the smokers, despite the best efforts of the Funds; and (3) other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking and having been offered smoking cessation programs.

*Id.* at 239–40.

In addressing the second policy factor, the court concluded that allowing recovery given the position of the labor union health and welfare trust in the chain of causation "would force courts to adopt complicated rules apportioning damages among [other] plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* at 240. Relying on a provision of New York law that prevents injured parties from recovering the cost of their medical care when they have been reimbursed by an insurance company, *see* N.Y. C.P.L.R. § 4545(c), the court concluded that the "smokers ... did not present a risk of double recovery." *Id.* at 240. The court went on to stress that "other remote payors like the employers [who paid into the Funds] or health insurers with whom the Funds may contract might bring suit claiming that they ultimately bore the

costs." *Id.* at 240. Though the court noted without deciding that the single satisfaction rule might "prohibit duplicative recoveries by [these] multiple plaintiffs against a single defendant, it would not cure the ultimate problem set forth in *Holmes,* that is, that courts would be forced to 'adopt complicated rules apportioning damages among' the Funds, the employers, and perhaps even the unions, each of which is 'removed at [a] different level[ ] of injury.'" *Id.* at 241.

With respect to the third policy factor—that more "'directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely'"—the court in *Laborers Local 17* reasoned that the ability of the Funds to "bring a subrogation action to recover the medical costs paid out for individual smokers" and the ability of the smokers themselves "to pursue their own causes of action for such additional types of injuries as pain and suffering" would, together, sufficiently vindicate "the general interest in deterring injurious conduct" and remedy injuries caused by Tobacco to counsel against finding proximate cause. *Id.* at 241.

Finally, the court in *Laborers Local 17* raised, without deciding, the possibility that "the presence of a specific intent to harm a particular plaintiff [might] weigh in favor of a finding of proximate cause where ... the existence of directness under the *Holmes* factors is in doubt." *Id.* at 242 n. 5. Having concluded that each of the three *Holmes* factors counseled against a finding of proximate causation, the court did not resolve what role specific intent would play in tipping the scales of the *Holmes* remoteness inquiry.

### d. Application to RICO Direct Payment Action

■ In beginning the inquiry into whether the *Holmes* remoteness factors are sufficiently satisfied to warrant a finding of proximate causation, the law is guided by two key principles. First, "[p]roximate cause is an elusive concept, one 'always to be determined *on the facts of each case* upon mixed considerations of logic, common sense, justice, policy and precedent.'" *Laborers Local 17,* 191 F.3d at 235 (emphasis added) (quoting W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, & David G. Owen, *Prosser & Keeton on the Law of Torts,* § 42, at 279 (5th ed. 1984)) [*Prosser and Keeton on the Law of Torts* ] (quoting 1 Street, *Foundations of Legal Liability,* 110 (1906)). Second, and closely related, is the notion that "[a]t bottom, ... proximate cause reflects 'ideas of what justice demands'" and "'of what is administratively possible and convenient.'" *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311 (*Prosser and Keeton on the Law of Torts, supra,* § 41, at 264.

In addressing the *Holmes* policy matters, the law cannot ignore the fact that it is Tobacco itself which has established this massive and pervasive fraud affecting the lives of millions of workers and necessarily created the risk of complex litigations affecting many levels of possible victims. Tobacco created the petard upon which it is hoist.

#### i Indirectness and Intervening Forces

Whether there are independent forces at play arising from the indirectness of the Trusts' injuries sufficient to counsel against a finding of proximate cause is a close issue. Under the first *Holmes* factor, the central focus is on *the intervening impact of independent forces operating between the alleged misconduct and the injury* at issue.

Tobacco points to alleged inefficiencies in the operation of the Trust, particularly in its earlier years, as a consideration which should counsel against a finding of proximate causation on the first *Holmes* factor. The inefficiencies in the Trust, however, *are not intervening causes brought about by the remoteness of the injury.*

The Supreme Court in *Holmes* noted that the inefficiencies of the broker-dealers were independent factors which counseled against proximate causation for the clients.

*See Holmes*, 503 U.S. at 273, 112 S.Ct. 1311 ("the broker-dealers' poor business practices or other failures to anticipated developments in the financial markets."). The inefficiencies in the Trust differ in kind from those the Supreme Court identified in *Holmes*. The inefficiencies of the broker-dealers existed at an intermediate link in the causal chain and necessarily complicated recovery because a jury would be called upon to speculate about the financial health and investment decisions of a non-party.

The alleged inefficiencies in the Trust do not exist at an intermediate point on the causal chain; that is, they are *not an independent factor brought about by the length of the causal chain*. To that extent, any inefficiencies in the operation of the Trust do not go to the issue of proximate cause as defined by the first *Holmes* factor, but are better dealt with as issues of causation-in-fact by the jury. Calculating what if any impact the Trust's alleged mismanagement or inefficiencies may have had on its damages will be no more complicated here than damage calculations are in antitrust suits brought by one company against another, where issues of plaintiff's mismanagement and inefficiencies invariably arise in determining loss causation and damages. *Cf. U.S. Football League v. National Football League*, 842 F.2d 1335 (2d Cir.1988).

Whether a sufficient intervening cause exists to weigh against proximate causation on the first *Holmes* factor properly centers around the issue of reliance by the asbestos-workers on Tobacco's alleged fraudulent omissions and misstatements. As an initial matter, it must be noted that this "intervening agency" problem is much less complicated than that faced by the court in *Laborers Local 17*. There the Fund alleged that *but for* Tobacco's misconduct, it would have instituted a smoking cessation program that would have in turn reduced smoking levels, ultimately lowering the Fund's outlays for tobacco-related illnesses. The court of appeals was particularly concerned about the difficulty in proving Tobacco's liability "where the inju-ries are alleged to derive not simply from [Tobacco's] affirmative misconduct but also from the [Fund's] fraudulently induced inaction." *Laborers Local 17*, 191 F.3d at 240.

The Trust's causal chain does not rely on the additional step of the Trust introducing a cessation program, and thus eliminates speculation over what subsequent effect such a program would have had on Claimants' smoking patterns. That link in the causal chain, and potential intervening causation problems it would generate, are absent.

As noted in section IV.B.2.c., the court specifically identified three uncertainties at work in *Laborer Local 17*'s causal chain that made any determination of Tobacco's liability too speculative:

> (1) the effect any smoking cessation programs or incentives would have had on the number of smokers among the plan beneficiaries; (2) the countereffect that the tobacco companies' direct fraud would have had on the smokers, despite the best efforts of the Funds; and (3) other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking and having been offered smoking cessation programs.

*Laborers Local 17*, 191 F.3d at 239–40. By eliminating the intervening agency of the Trust in initiating a cessation program from the causal chain, and instead looking only to the misconduct of Tobacco and its impact on asbestos-workers' smoking behavior, the Trust's RICO Direct Payment Action avoids the second uncertainty identified by the court of appeals in *Laborers Local 17*—the countereffect of the tobacco companies' fraud despite the Fund's cessation program.

Furthermore, the remaining two uncertainties at work in *Laborers Local 17* are substantially reduced by plaintiffs statistical model. The first uncertainty in *Laborers Local 17*, the effect of the Fund's cessation program, is essentially comparable in the present case to the effect Tobacco's

fraudulent misrepresentations and omissions had on asbestos-workers' behavior. The Harris Model substantially addresses this uncertainty by incorporating data from similarly situated asbestos-workers who, unlike the Trust's claimants, were informed beginning in the 1960s of the smoking-asbestos synergy and its effects on human health. Relying on the smoking behavior of these similarly situated individuals and their reaction to the truth about synergy, the jury has a real world guide to measure the effect of Tobacco's alleged misrepresentations and omissions

The third uncertainty identified in *Laborers Local 17*—"other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking"—is substantially lessened here over its potency in *Laborers Local 17*. The exponentially higher injury rates facing asbestos-workers from smoking relative to members of the general population, which was the population the court was generally dealing with in *Laborers Local 17*, weighs heavily here. Asbestos-workers faced a relative risk of developing lung cancer *which was some 500% greater than that faced by the smokers in the general population who were not occupationally exposed to asbestos*. Presented with these figures, it is difficult for the court—at least as a legal question of proximate causation—to find that the "other reasons" suggested in *Laborers Local 17* would, in any meaningful sense, lead asbestos-workers to continue smoking.

The only significant reason thus far identified as leading asbestos-workers to continue smoking when informed of the enormous health risk is nicotine addiction. Since the Tobacco entities are alleged to have misrepresented the addictiveness of nicotine and intentionally introduced greater quantities of, or more effectively acting, nicotine into cigarettes to foster addiction, nicotine addiction is not an intervening cause leading to injury, but a direct product of Tobacco's alleged fraudulent scheme, supporting proximate causation on the first *Holmes* factor.

### ii Duplicative Recovery and Complex Damages Apportionment

The second policy factor addressed in Holmes "focuses on the possibility that 'recognizing claims of the indirectly injured *would force* courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.'" *Laborers Local 17*, 191 F.3d at 240. Contrary to the situation in *Laborers Local 17*, this factor weighs heavily in favor of proximate causation for the RICO Direct Payment Action.

Defendants argue that allowing the Trust to recover would create the risk of multiple recoveries by the Claimants themselves, either through individual actions, a national class action, or as part of an equitable subrogation claim brought by a health insurance entity.

That argument fails because it neglects the relationship of the Tobacco entities to the Trust: they are joint-tortfeasors. As defendants have pointed out numerous times, the Trust stands in this litigation as an "admitted tortfeasor." *See, e.g.*, Defs' Mem. of Law in Resp. to Plfs' Briefing on Leg. Theories & in Support of Mots. to Dis. & for Summ. Judg., at 15 ("As part of the confirmed Plan, Manville channeled to the Trust, and the Trust assumed, all liability for personal injury claims caused by Manville's tortious conduct. The Trust thus became an admitted tortfeasor[.]").

A victim of a tort caused by multiple tortfeasors does not obtain overlapping recoveries. As the Restatement provides:

> A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, *as are payments made by another who is, or believes he is, subject to the same tort liability.*

Restatement (Second) of Torts § 920A(1) (1979) (emphasis added); *cf. id.* § 920A(2) ("Payments made to or benefits conferred on the injured party from other sources

are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.").

Allowing recovery by the Trust would not thrust upon courts involved in future litigation on behalf of Trust Claimants who smoked the obligation of "adopt[ing] complicated rules apportioning damages." *Laborers Local 17*, 191 F.3d at 236–37. Allowing recovery in this action by the Trust would substantially clarify in a single action both Tobacco's share and the Trust's share of liability for Claimants' injuries, potentially simplifying *highly unlikely* future litigation brought by Trust Claimants against Tobacco.

Finally, unlike what the court of appeals faced in *Laborers Local 17*, recovery by the Trust would not create the danger that "other remote payors [standing in the causal chain behind the Trust] like employers ... might bring suit claiming that they ultimately bore the costs[,]" creating the possibility of downstream duplicative recoveries. *Id.* at 240. In fact, the Trust is a limited fund entity that does not have new or continuing sources of revenue. Monies paid out by the Trust to Claimants today are not replenished from other sources—*these payments are costs borne solely by the Trust. Cf. International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 824 (7th Cir. 1999) ("The Funds and the Blues are just financial intermediaries. They collect the premiums and spend them to provide the contracted-for care; their books balance whether the costs of care are high or low. Smokers, employers, and other purchasers of insurance, not the Funds and the Blues, foot the medical bill in the end.").

Any recovery by the Trust would neither create the danger of duplicative recovery nor would it in itself force the adoption of complicated rules of apportionment in future litigation. The second *Holmes* factor counsels for a finding of proximate causation.

### iii Ability of More Direct Victims to Remedy Violation

The third *Holmes* factor is whether there are more "directly injured parties who can remedy the harm without the[ ] attendant problems [identified in the first and second *Holmes* factors]." *Laborers Local 17*, 191 F.3d at 237. Resolution of this issue turns in substantial part upon whether Trust Claimants who smoked would be better suited to remedy existing injuries caused by Tobacco's conduct. *See, e.g., Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 n. 10, 105 S.Ct. 3275 (section 1964 is remedial).

The "intervening agency" problems raised with the first *Holmes* factor—specifically issues of Claimants' reliance on Tobacco's conduct—would not be simplified. Suits brought by Trust Claimants for asbestos-related injuries sustained as a result of smoking-asbestos synergy would still require consideration of the extent to which the Claimants relied on Tobacco's alleged fraudulent omissions and misrepresentations. And as noted in the discussion of the second *Holmes* factor, litigation by the Trust does not as a practical matter pose a danger of duplicative recovery nor does it require *in and of itself* the adoption of complicated rules of apportionment; it would simplify the process of apportioning liability in actions by Trust Claimants by globally resolving that issue. Suit by Trust Claimants who smoked as opposed to suit by the Trust would not eliminate the issues raised by the intervening agency of the Claimants or "the need to grapple with the problems of calculating and apportioning damages," which concerned the Supreme Court in *Holmes* and the court of appeals in *Laborers Local 17. Laborers Local 17*, 191 F.3d at 241 (citing *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311).

It must also be observed that recovery by the Trust against the Tobacco entities would be distributed to those *most* directly injured by Tobacco's alleged conduct. According to Tobacco's own estimates, some 80% to 90% of Trust Claimants smoked

and are consequently the ones most likely to have suffered from smoking-asbestos synergy. Though defendants have identified a number of cases where federal courts determined the *Holmes* factors were not sufficiently established to warrant a finding of proximate causation, none of those cases involved a situation where allowing recovery by the less directly injured entity would have the effect of substantially vindicating the more immediate victims. *See, e.g., Texas Carpenters Health Benefit Fund v. Philip Morris Inc.,* 199 F.3d 788 (5th Cir.2000) (suit by nonprofit labor-management trust funds); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957 (9th Cir.1999) (same); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3d Cir.1999) (same); *In re Tobacco/Governmental Health Care Costs Litigation,* 83 F.Supp.2d 125 (D.D.C.1999) (suit by Republic of Guatemala); *Seafarers Welfare Plan v. Philip Morris,* 27 F.Supp.2d 623 (1998) (suit by non-profit labor-management trust funds) (D.Md.1998).

Given that civil-RICO's underlying purpose is remedial, the fact that both Trust Claimants who smoked and were injured by smoking-asbestos synergy, and non-smoker Trust Claimants whose interest in the Trust has been depleted through the creation of greater and more sever injuries by the smoking Claimants, recovery by the Trust would have the effect of providing greater relief to *more* victims of Tobacco's conduct than highly unlikely ad hoc litigation by the hundreds of thousands of Trust Claimants who smoked. For example, windfall recoveries by a limited number of Trust Claimants who litigate individual actions against Tobacco would not vindicate civil RICO's remedial purposes as fully or as equitably as a single recovery by the Trust and subsequent distribution to *all the Claimants.*

This conclusion is buttressed by the growing resistance a number of federal and state courts have displayed to the class action device, which, were it permitted, might alternatively provide an equitable recovery to Trust Claimants. *See, e.g., Barnes v. American Tobacco Co.,* 161 F.3d 127 (3d Cir.1998); *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir.1996); *Geiger v. American Tobacco Co.,* 181 Misc.2d 875, 696 N.Y.S.2d 345 (N.Y.Sup. Ct.1999). The feasibility of a class action to one side, to now force these victims of the compounded conspiracies of the asbestos and the tobacco industries back into court once more, after having already fought to receive partial recovery from the asbestos industry, would do a large mass of litigants a grievous injustice. Enormous sums would be consumed in litigation costs that would otherwise be available for recovery to Claimants. The judicial system would be unnecessarily burdened with potentially thousands of individual actions seeking to effectively vindicate RICO's remedial aims, which the present action by the Trust would do. *See Prosser and Keeton on Torts, supra,* § 41, at 264 (5th ed. 1984) ("[Proximate cause] is associated with policy—with our *more or less inadequately expressed ideas of what justice demands,* or of what is *administratively possible and convenient.*" (emphases added)).

In short, allowing recovery by the Trust would substantially advance the remedial purposes of civil RICO relative to individual litigations, or even a multitude of class actions, brought by more immediately injured asbestos-workers who smoked.

iv  Specific Intent

The court of appeals intimated in *Laborers Local 17* that the presence of a specific intent to harm a particular plaintiff weighs in favor of finding proximate cause when "the existence of directness under the *Holmes* factors is in doubt." *Id.* at 242 n. 5. Though the second and third *Holmes* factors alone strongly counsel in favor of proximate causation, with the first factor providing no dispositive resolution, the evidence introduced by plaintiffs suggesting a specific intent of Tobacco to thrust its share of liability for Claimants' injuries onto the Trust leaves no doubt that a

determination of proximate causation is appropriate here.

As evidence of Tobacco's specific intent to shift liability onto the Trust (and related asbestos entities), plaintiffs introduced a memorandum by R.J. Reynolds counsel titled "Smoking and Health Litigation Integrated Exposure and Hazard Assessment Initiative" dated January 20, 1987. The memorandum identified as a goal of the company "[s]hift[ing] a proportionately [sic] higher amount of risk (maybe all) to the asbestos defendants ...." Plfs' Counterstatement on Direct Injury, at 21.

Given that two of the three *Holmes* policy considerations unambiguously counsel in favor of proximate causation and that sufficient evidence exists that Tobacco specifically intended to shift its share of the liability for injuries from smoking-asbestos synergy to the Trust, plaintiffs have established proximate causation on the RICO Direct Payment Action.

Defendants' motion for summary judgment for lack of causation on the RICO Direct Payment Action is accordingly denied.

### B. Statute of Limitations

Civil RICO actions are subject to a four year limitations period. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The limitation begins to run when the injury occurs.

The analysis is complicated when the same pattern of racketeering activity results in "[m]ultiple injuries, spread over time." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir.1988) ("Even after injury has occurred ... and a civil RICO claim has accrued, there will frequently be additional, independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to plaintiff's business or property."). To deal with such instances, the court of appeals for the Second Circuit has adopted the "separate accrual rule under which a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir.1995).

"A necessary corollary of the separate accrual rule is that plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Id.* at 560. As the court of appeals distinctly stated, "[a]s long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year 'window' before suit was filed, together, of course, with any provable future damages." *Id.*

The separate injury accrual rule of the Second Circuit was not altered by the Supreme Court's recent decision in *Rotella v. Wood*, —— U.S. ——, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). It rejected an accrual rule based upon the discovery of a pattern of RICO activity. *Id.* at 1080–82. The Court's reasoning in *Rotella* reflected a concern that, if such a rule were adopted, a plaintiff might not discover a pattern, and his cause of action therefore would not accrue until many years after the plaintiff realized the actual injury.

"The first step in the statute of limitations analysis is to determine when the [plaintiffs] sustained the alleged injur[ies] for which they seek redress." *In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 59 (2d Cir.1998) (per curiam). The alleged injuries suffered by the Trust occurred on the date each claim was filed, because that is the earliest possible date the Trust could discover that specific injury.

In light of the four year statute of limitations and the separate injury accrual rule, plaintiffs may recovery for any claims filed with the Trust on or after November 11, 1995, four years from the date the

Trust first asserted a civil RICO claim. Recovery prior to that date is barred by the statute of limitations.

## IV SECTION 1962(a)-RELATED CLAIM

■ Plaintiffs' RICO Investment Action, which seeks recovery under civil RICO for a violation of section 1962(a) of Title 18, suffers from the same defect as the RICO Litigation and Settlement Actions. As with those actions, plaintiffs have failed up to this point to establish sufficient causation-in-fact. Furthermore, possible amendment to the pleadings to correct the deficiencies is not warranted in light of the imminence of trial and the existence of the RICO Direct Payment Action as a viable theory. *See* Part IV. A. 1. b. *supra.*

The essence of plaintiffs' Investment Action is that Tobacco engaged in a racketeering scheme—the "Tobacco Conspiracy Enterprise"—"to fraudulently misrepresent and conceal material facts about the health effects of smoking, including but not limited to addictive properties of nicotine and the lethal synergistic effect of exposure to both cigarette smoke and asbestos." Plfs' Rep. Mem. of Law in Resp. to Crts' Req. for Briefing with Respect to Plfs' Leg. Theories, at 40–41 [hereinafter "Pfs' Rep. Mem."]. Tobacco then invested the proceeds from the scheme into "the Council for Tobacco Research—USA, the Tobacco Institute, the Committee of Counsel, the BAT Research Group and the Tobacco Conspiracy Enterprise, as well as reinvesting in themselves." *Id.* at 41. "Each of these enterprises then used their funds—the proceeds of [the Tobacco Conspiracy Enterprise]—and put them to use in ways that were designed to shift the liabilities for their wrongful acts to the . . . Trust."

Plaintiffs identify the "injurious acts" brought about by the investment of the racketeering proceeds as the maintenance of the racketeering scheme, the creation of "public relations machines" to "disavowal . . . legitimate scientific research," and the creation of a "litigation 'machine' that used

scorched-earth tactics." *Id.* at 41, 43; *see* Am. Compl. ¶ 175.

### A. "Reinvestment" Injury

Section 1962(a) provides:

It shall be unlawful for any person who has received income derived, directly or indirectly, from a pattern of racketeering activity . . . to invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1964(c) authorizes recovery for injuries resulting "by reason of" violations of this provision. 18 U.S.C. § 1964(c); *see Ouaknine v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990) ("[A] 'plaintiff only has standing if, and can only recover to the extent that, he has been injured by the conduct constituting the violation.'") (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

As both parties concede, the "by reason of" language in section 1964(c) requires that the alleged injury must be caused by the investment of the racketeering proceeds. *See, e.g., Compagnie De Reassurance v. New England Reinsur.,* 57 F.3d 56, 91 (1st Cir.1995) ("in proving a right to recovery for a RICO violation premised upon § 1962(a), the plaintiffs had to prove that they *were harmed by reason of [defendant's] use or investment* of income derived from a pattern of racketeering activity . . . ." (emphasis added)); *Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 584 (5th Cir.1992) ("the causal language of section 1964(c) requires that the compensable injury stem from the violation of the RICO section in question, so *any injury under section 1962(a) must flow from the use or investment of racketeering income* " (emphasis added)); *Brittingham v. Mobil Corp.,* 943 F.2d 297, 304–05 (3d Cir.1991) ("[T]o recover under § 1962(a), the plaintiff must demonstrate

that his injuries were *proximately caused by that violation.*" (emphasis added)); *Danielsen v. Burnside–Ott Aviation Training Center, Inc.*, 941 F.2d 1220, 1230 (D.C.Cir.1991) ("[T]o make out a claim under § 1962(a) as incorporated by § 1964(c), a plaintiff *must allege and prove an injury arising from use or investment of racketeering income.*" (emphasis added)); *Ouaknine*, 897 F.2d at 83 ("[B]ecause the conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff *must allege injury from the defendant's investment of the racketeering income* to recover under § 1962(a)." (emphasis added)). *But see Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir.1990) (predicate acts alone are sufficient to state a section 1962(a) injury). That is, the investment of racketeering proceeds in violation of section 1962(a) must have been a *"substantial factor"* in causing the injury. *Brittingham*, 943 F.2d at 304–05 (emphasis added).

Plaintiffs allegation that the "reinvestment" of proceeds from the "Tobacco Conspiracy Enterprise" back into it harmed the Trust by perpetuating the scheme is not presently persuasive. For civil RICO actions alleging violations of section 1962(a), "the plaintiff [must] allege a 'use or investment' injury that is *distinct* from the injuries resulting from predicate acts." *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996); *see, e.g., Vemco, Inc. v. Camardella*, 23 F.3d 129, 133 (6th Cir.1994) ("Nowhere in the amended complaint ... did [plaintiff] allege an injury stemming from the investment, distinct from injuries stemming from predicate acts.... Such allegations do not meet th[e] ... requirement of a distinct 'investment injury.'").

Where reinvestment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity. *See, e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir.1993) ("[W]e have recognized repeatedly that ... the use and investment of racketeering income [to] keep[ ] the defendant alive so that it may continue to injure plaintiff ... is insufficient to meet the injury requirement of section 1962(a)"); *Soberman v. Groff Studios Corp.*, 99 Civ. 1005, 1999 WL 349989, *5 (S.D.N.Y. June 1, 1999) ("allegations that money was used or invested to further the same scheme are insufficient [to state a claim under section 1962(a) ], since they do not allege a *distinct [investment] injury* " (emphasis added)); *Kaczmarek v. Inter. Bus. Machs. Corp.*, 30 F.Supp.2d 626, 628 (S.D.N.Y. 1998) ("Mere reinvestment of racketeering income into the same racketeering enterprise that generated the income 'does not satisfy the Second Circuit's holding in *Ouaknine* ' because 'investment of the proceeds from the pattern of racketeering for general operations is too attenuated a causal connection to satisfy section 1962(a) and 1964(c).' Under these circumstances, *the real cause of the injury remains the racketeering acts, not the investment of the proceeds in the enterprise.*" (emphasis added)); *Protter v. Nathan's Famous Systems, Inc.*, 925 F.Supp. 947, 954 (E.D.N.Y. 1996) ("allegations that the predicate acts caused the injury, or that the defendants reinvested their income in an enterprise conducting unlawful activity will not suffice [for recovery under section 1962(a) ]."); *see also R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F.Supp. 630, 641–42 (S.D.N.Y.1995) (same) (citing additional cases).

### B. Other Investment Injuries

Plaintiffs also allege investment injuries to the Trust from the establishment and operation of Tobacco's "public relations machines" and Tobacco's aggressive legal tactics, which plaintiffs refer to as a "scorched earth" "litigation machine." Plfs' Rep. Mem. at 41, 43; *see* Am. Compl. ¶ 175. In making these allegations, plaintiffs disaggregate Tobacco's conduct, essentially arguing that Tobacco was engaged in two separate, though admittedly related, schemes: one directed at the smoking public and the other directed at

"shift[ing] liability for personal injuries from the tobacco companies to asbestos entities like the Trust." Pfs' Rep. Mem. at 43. Plaintiffs contend that Tobacco "took the proceeds of their acts of racketeering perpetrated on the public and invested them into litigation and public relations machines whose purpose and effect was to wrongfully shift" Tobacco's liability to the Trust. *Id.*

Assuming that the plaintiffs can parse Tobacco's scheme as they attempt, they have nonetheless failed to establish evidence to date that Tobacco's efforts to thrust its liability onto the Trust *in fact caused* the Trust injury.

### 1. Maintenance of a Public Relations Machine

With respect to fraudulent misrepresentations and omissions emanating from Tobacco's "public relations machines," plaintiffs have failed to produce evidence that the Trust actually relied on them. As discussed in section IV.A.1.b., *infra*, the Trust was aware of Tobacco's contributing liability to the harm suffered by Claimants due to smoking-asbestos synergy. By the Trust's own admission, it was a concern that the litigation could not be won, rather than reliance on direct or indirect misrepresentations about the health effects of synergy, that caused the Trust not to file suit against Tobacco. As David Austern testified:

> The operational decision not to sue [Tobacco] ... was a decision that I made in 1988 and 1989 on the grounds that it was imprudent to use trust funds to bring a case where you could not find the documents to prove the case and the only way you could prove the case was to spend money in search of the documents.

Austern Dep. 9/26/99 at 213; *see also* Defs' First Requests, Request # 36 (admitting Trust has not learned anything from Tobacco that has altered its quantification of relative risks of diseases attributable to smoking and to asbestos). In the absence of reliance by the Trust on misrepresentations of Tobacco's "public relations machines"—either directly or indirectly—causation is lacking between Tobacco's investment of racketeering funds in the "public relations machines" and the Trust's assumption of Tobacco's liability to Claimants, the injury for which the Trust seeks recovery.

Robust defense of legal rights which do not overstep the bounds of legal ethics or abuse of court procedures do not alone create a cognizable RICO injury.

### 2. Maintenance of a Litigation Machine

Plaintiffs identify investment of racketeering proceeds from the "Tobacco Conspiracy Enterprise" into Tobacco's "litigation machine," which used "scorched-earth tactics" during litigation, as an investment injury because, plaintiffs allege, the Trust was effectively intimidated into not suing Tobacco.

As a threshold matter, Tobacco relies on the *Noerr–Pennington* to argue that their earlier litigation strategies cannot form the basis of a RICO investment injury.

#### a. *Noerr–Pennington* Doctrine

The *Noerr–Pennington* doctrine developed "in a series of cases in which it was alleged that defendants' attempts to obtain commercially favorable actions from different branches of government violated the Sherman Act." *Suburban Restoration Co., Inc. v. Acmat Corp.*, 700 F.2d 98, 100 (2d Cir.1983). "The essence of the doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Inter. Production, Inc. v. Warner–Amex Cable Comm., Inc.*, 858 F.2d 1075, 1082 (5th Cir.1988).

The "doctrine is a direct application of the Petition Clause" of the First Amendment. *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1059 (9th Cir.1998); *see* U.S. Const. amend. 1. Though it initially arose in the context of lobbying for legislative action, it was subsequently expanded "to include activities aimed at the

executive and judicial branches of government." *Kottle,* 146 F.3d at 1059; *see California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (judicial branch); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (executive branch). In applying the doctrine to litigation activities, the Supreme Court reasoned "[c]ertainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition." *California Motor Transp. Co.,* 404 U.S. at 510, 92 S.Ct. 609; *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances.").

The immunity provided by the *Noerr–Pennington* doctrine is not absolute. A "sham" exception exists for

> situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an [injurious] weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. A "sham" situation involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all, not one "who genuinely seeks to achieve his governmental result, but does so *through improper means".*

*City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (emphases in original) (internal citations omitted).

The "scope of the sham exception depends on the type of governmental entity involved." *Kottle,* 146 F.3d at 1060. In the context of litigation before a judicial body, the evidence of injurious intent behind the use of the process, as opposed to the outcome of the process, cannot alone "transform otherwise legitimate activity into a sham." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 59, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("[T]he legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any [injurious] purpose [the actor] may have had.' "). Essentially recognizing both the difficulty of separating legitimate suits from suits brought purely to inflict injury through the litigation process itself and the potential chilling effect on legitimate litigation, the Supreme Court has reasoned "the sham exception contains an indispensable objective component." *Professional Real Estate Investors, Inc.,* 508 U.S. at 58, 113 S.Ct. 1920.

If an objective litigant could conclude that the suit

> is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and ... the sham exception must fail. Only if the challenged litigation is *objectively meritless* may a court examine the litigant's subjective motivation.

*Id.* at 60, 113 S.Ct. 1920 (footnote omitted) (emphasis added); *see id.* at 60 n. 5, 113 S.Ct. 1920 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

b. Application of *Noerr–Pennington* 's Principles

Defendants alleged investment of RICO racketeering funds into a scorched earth litigation strategy does not directly invoke the concerns underlying the *Noerr–Pennington* doctrine. As discussed above, the *Noerr–Pennington* doctrine emanates from the right of individuals to petition the government for redress, including the courts.

Defendants, having been hailed into court in the earlier litigations, were clearly not exercising their right to petition the government. There is a difference in kind between abusing one's right to access the judicial forum in order to injure

**352**

a plaintiff by bringing a frivolous suit, or a series of frivolous suits, and once having been hailed in to court by an opposing party, utilizing the tools of the adversarial process in a vigorous defense. The later invokes issues of procedural due process under the Fifth and Fourteenth Amendments, rather than the First Amendment right to petition the government.

Once engaged in meritorious litigation, a party may rely on the tools of discovery and motions practice to the extent permitted by the rules of the forum and the court. It is doubtful that the aggressive use of these tools *in the absence of unethical or illegal actions can constitute injurious conduct under civil RICO. Cf. Cipollone v. Liggett Group, Inc.,* 668 F.Supp. 408, 410 (D.N.J.1987) ("illegal or unethical conduct" designed to "subvert the integrity of the governmental process" "is not worthy of [*Noerr–Pennington*] protection").

To be sure, plaintiffs have identified evidence that, if true, would establish that Tobacco had a subjective intent to thwart future litigation through the aggressive use of discovery and pleadings:

- An August 5, 1982 R.J. Reynolds document listing as part of tobacco's litigation strategy to "[i]ncrease costs and delay to those suing us," (Plfs' Counterstatement on Direct Injury, at 20);
- A December 5, 1985 Tobacco Institute document stating: "Our strategy is to file motions to sever the cross-complaints and either to stay proceedings or to dismiss without prejudice.... If we lose our motions, we will proceed with massive discovery." (Plfs' Counterstatement on Direct Injury, at 20); and,
- A November 5, 1992 memorandum from M.H. Bring at Philip Morris stating with respect to Tobacco's litigation strategy: "the message to the plaintiffs' bar will be clear. After ten years of litigation, during which Edell was more determined and more successful than any other plaintiff's counsel in the history of these lawsuits, he has decid-

ed to withdraw. Hopefully, that message may cause lawyers involved in other pending cases to consider whether they want to continue the battle." (Plfs' Counterstatement on Direct Injury, at 21).

As with the *Noerr–Pennington* doctrine, however, subjective intent to do harm through the litigation process is not alone sufficient to strip immunity from the conduct. The Trust must establish that Tobacco's use of the aggressive litigation tactics was objectively an abuse of the judicial process, either because it was unethical or illegal. *But see generally* John Leubsdorf, *Using Legal Ethics to Screw Your Enemies and Clients,* 11 Geo. J. Leg. Ethics 831, 839–42 (1998) (Tobacco attorneys' conduct). To date it has not done so.

Even in the absence of immunity for Tobacco's litigation conduct, plaintiffs have failed to establish causation between that conduct and its injuries. The Trust never brought suit against Tobacco, and having failed to do so, it cannot establish that Tobacco's litigation conduct against others was a "substantial factor" causing its injuries. This multi-billion dollar Trust can hardly plead that it was shut-out from the court system by its indigency.

This conclusion of lack of legally cognizable harm from Tobacco's aggressive defense is buttressed by the fact that the chain of causation involves substantial intervening factors. *See Prosser and Keeton on Torts, supra,* § 44, at 301–19 (intervening causes). These include the possibility that: (1) as a legal requirement to sue Tobacco under various state laws, the Trust would have been forced to continue Claimant litigation rather than to settle; and (2) that, even assuming the Trust had impled Tobacco into the various suits by Claimants, the Trust would been successful against Tobacco. Plaintiffs introduced no evidence to overcome these causation problems. In the absence of such evidence, plaintiffs have failed to meet their burden of establishing a sufficient causal relationship be-

tween Tobacco's investment of alleged racketeering funds into "scorched earth" litigation strategies and the Trust's injuries.

Summary judgment on this theory is thus proper.

## VI SECTION 1962(d)–RELATED CLAIMS

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Plaintiffs have pled conspiracy allegations with respect to the RICO Settlement Action, the RICO Litigation Action, the RICO Direct Payment Action, and the RICO Investment Action.

■ "Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993); *see Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996) (same).

Plaintiffs having failed to establish causation with respect to the RICO Settlement Action, RICO Litigation Action, and RICO Investment Action, the related conspiracy claims must necessarily fail and are accordingly dismissed.

## VII STATE FRAUD ACTION

Plaintiffs' state law fraud action—which invokes principles of both fraud and trust law—seeks recovery of monies expended by the Trust to compensate Claimants for injuries suffered as a result of Tobacco's fraud, directed at Claimants, regarding smoking-asbestos synergy.

### A. Choice of Law

■ As a threshold matter, the court must decide which state's substantive law governs. "A choice of law question is presented when a dispute implicates the interests of two or more states and application of each state's law would be consistent with the Full Faith and Credit and Due Process Clauses of the Constitution." *Hamilton v. Accu–Tek*, 47 F.Supp.2d 330, 335 (E.D.N.Y.1999).

■ A federal court faced with a choice-of-law question will apply the choice-of-law rules of the forum state; in this case that requires application of New York's rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The New York Court of Appeals has adopted an "interest analysis" for torts conflicts. *See, e.g., Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (Fuld, J.); *see generally* Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 Colum. L.Rev. 772, 827 (1983). The guiding principle underlying the "interest analysis" is that "[j]ustice, fairness and, the best practical result, may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *Babcock*, 12 N.Y.2d at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (internal quotation marks and citation omitted).

In a series of subsequent cases the Court of Appeals has refined the interest inquiry, "fashioning an analysis which gives the greatest weight to those contacts which are relevant to the policies animating the particular rules in conflict." *Hamilton*, 47 F.Supp.2d at 336; *see id.* at 336–38 (describing refinements). Those rules are normally dispositive, providing a workable framework for analyzing the facts and for resolving the choice-of-law issue. *See, e.g., Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993); *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985).

The national scope, indeed worldwide scope, of the fraudulent conduct alleged to have injured the Trust undermines the usefulness of those rules, which were con-

structed to resolve conflicts disputes in more run-of-the-mill torts cases. Rather, the court must return to the general principle announced in *Babcock*, that "controlling effect [should] be given to the law of the jurisdiction which has the greatest interest in the specific issues raised in the litigation." *Babcock*, 12 N.Y.2d at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279.

■ Application of this bedrock principle leads to the conclusion that New York law governs the Trust's common-law fraud claim. Though Tobacco's alleged conspiracy was carried out throughout the Nation and world, substantial and vital portions of the alleged conspiracy were orchestrated and implemented in New York. For example, CTR and TI, allegedly the major vehicles for perpetuating Tobacco's fraud, both operated in New York. *See, e.g., Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 107 (E.D.N.Y.2000) ("CTR's offices in New York City generated critical data with which to dispute and deflect attention from the evidence linking smoking to lung cancer, heart disease and other illnesses. H & K, the public relations firm instrumental in the formation of both CTR and TI, was ... deeply involved in the operation of both these organizations. H & K is a New York corporation with its principal place of business in New York. JM & F, the law firm which administered [CTR's] 'special account' and played an important role in CTR 'special projects' is located in New York City."). Several of the Tobacco companies operate in New York City, and at least one, Philip Morris, Inc., alleges New York to be its principal place of business. *See* Defs' Mem. of Law in Opp. to Plfs' Mem. of Law on Subject Matter Juris. Based Upon Diversity of the Parties, at 2 ("Philip Morris' headquarters and corporate command center, is, and has been for over 80 years, located in New York, New York.").

Importantly, the Trust itself is a New York entity, being a creature of New York trust law and having its principle operations in New York City. Accordingly, New York has the greatest interest in ensuring the solvency of the Trust and in preventing fraudulent conduct of others from eroding the Trust's corpus.

Application of New York's substantive law to plaintiffs' fraud claim is also consistent with the modest constitutional requirements emanating from the Full Faith and Credit and Due Process Clauses. These constitutional constraints are satisfied if the state whose law is chosen "has significant contacts or significant aggregation of contacts creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). By any measure, the application of New York law to Tobacco's fraudulent conduct injuring the Trust satisfies that standard.

### B. Fraud

■ Plaintiffs seek recovery for funds paid to Claimants as a result of Tobacco's alleged fraudulent scheme to misrepresent and hide the health hazards of smoking-asbestos synergy from Claimants. The Trust, however, does not allege that it was misled by Tobacco's fraudulent misrepresentations and omissions regarding synergy.

■ As a general proposition, New York requires the party seeking recovery for an action sounding in common-law fraud to establish that *he was misled,* rather than merely alleging that the misrepresentations and omissions in question were relied on by a third party. *See, e.g., Cement and Concrete Workers District Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir.1998) ("[A] plaintiff does not establish the reliance element of fraud for purposes of ... New York law by showing only that a third party relied on a defendant's false statements."). Defendants seek summary judgment on this ground. *See* Defs' Mem. of

Fact and Law Regarding Choice of Law Issues, at 52 ("Plaintiff[s] may not assert the reliance of [Claimants] as a substitute for [the Trust's] missing reliance.").

The Trust's common-law fraud claim raises novel legal and factual issues under New York law. The relationship between the Trust and its Claimants is not an arm-lengths relationship, but is a fiduciary relationship in which the Claimants are essentially wards of the Trust. The corpus of the Trust is fundamentally the aggregated undivided interest of the present and future Claimants, over 80% of whom were asbestos-exposed smokers who allegedly relied on Tobacco's fraudulent scheme.

The New York Court of Appeals has clearly not decided whether or when a plaintiff's allegation of third party reliance may suffice to establish fraud. In the motion for summary judgment, Tobacco identifies several decisions of the Appellate Division for the proposition that third party reliance is insufficient to make out a fraud action. *See, e.g., Orlin v. Torf,* 126 A.D.2d 252, 513 N.Y.S.2d 870 (3d Dept. 1987); *Escoett & Co. v. Alexander & Alexander, Inc.,* 31 A.D.2d 791, 296 N.Y.S.2d 929 (1st Dept.1969); *Ryan Ready Mixed Concrete Corp. v. Coons,* 25 A.D.2d 530, 267 N.Y.S.2d 627 (2d Dept.1966). None of these cases involved a fiduciary relationship such as that between the Trust and its Claimants where the relying third party and the plaintiff essentially stand together.

Allowing the Trust to assert reliance by it Claimants in support of the fraud action—given the unique, heavily fiduciary nature of the relationship between the Trust and its Claimants, resulting in essentially a singular identity and unity of interest between the two—is not inconsistent with New York's general requirement that the party bringing the action establish reliance.

Defendants also seek summary judgment of the fraud claim alleging that the Trust must, but has so far failed to, identify the specific misrepresentations each Claimant suffering from smoking-asbestos synergy relied on in continuing to smoke.

As with the reliance showing necessary for RICO causation, the vast unprecedented nature of the fraudulent scheme alleged counsels against requiring the Trust to establish reliance by the Claimants on specific misrepresentations. Instead, the Trust need only establish:(1) that the defendants intentionally engaged in a scheme to distort the body of public knowledge, (2) that the defendants were successful in doing so (e.g., a substantial factor causing the distortion), (3) that there was detrimental reliance on this distorted knowledge by an intended and foreseeable class of victims (e.g., the Trust Claimants who smoked), (4) that such reliance was reasonable in the totality of the circumstances, and (5) that the plaintiff was proximately injured by this reliance. In view of the huge numbers of people affected, statistical evidence may be relied upon.

At this stage in the litigation, plaintiffs have made a sufficient showing to meet the requirements of New York state common-law fraud actions. Defendants' motion for summary judgment is denied.

C. Statute of Limitations

■ New York requires that a cause of action for fraud be brought within six years from the time of the injury resulting from the fraud. *See* C.P.L.R. § 213(8). For purposes of the state fraud action, the statute of limitations runs from the filing of the original complaint in *Falise I,* which was December 31, 1997. *See, e.g., Schutz v. Finkelstein, Bruckman, Wohl, Most & Rothman,* 247 A.D.2d 460, 461, 668 N.Y.S.2d 669 (2d Dept.1998) ("The defendants at all times were on notice of the facts and occurrences giving rise to the . . . claim and have not demonstrated any prejudice or surprise in connection with [allowing relation back to the filing of the original complaint].").

Accordingly, plaintiffs may seek recovery for claims filed with the Trust on or after December 31, 1991. Recovery for claims filed before that date are barred by the state statute of limitations.

### D. Certification

It is respectfully recommended that, should an appeal ultimately be taken with respect to the choice of New York law or to the substance of the fraud claim, the panel for the court of appeals certify those issues to the New York Court of Appeals. *See* 22 NYCRR § 500.17; Second Circuit Local Rule 0.27.

■ A federal court of appeals is necessarily limited in its ability to speak to questions of state law with any certitude. They generally must be more conservative in resolving novel issues of state law than the highest state court, since they are limited to predicting the proper disposition based on earlier precedents developed under substantially different social and economic conditions. *See, e.g., McCarthy v. Olin Corp.*, 119 F.3d 148, 157 (2d Cir.1997) (Calabresi, J., dissenting) (certification avoids problem of excessive determination of state law by federal judges); *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir.1999) (Sack, J.) (given lack of controlling precedent from highest state court and fact that applicability of doctrine developed by intermediate court was uncertain, author of opinion would have been inclined to certify question to New York Court of Appeals); *see also Hamilton v. Accu–Tek*, 62 F.Supp.2d 802, 847–48 (E.D.N.Y.1999).

It is for this reason that federal district courts have generally been thought to have greater leeway in applying interpretations of state law by federal courts of appeals—particularly in cases involving novel factual issues or developing legal doctrine—than is the case regarding interpretations of federal law. *See, e.g.,* Jed I. Bergman, Note, *Putting Precedent in its Place: Stare Decisis and Federal Predictions of State Law*, 96 Colum. L.Rev. 969 (1996); Nikoforos Matthews, Note, *Circuit Court Erie Errors and the District Court's Dilemma: From Rotolith and the Mirror Image Rule to Octagon Gas and Asset Securitization*, 27 Cardozo L.Rev. 739 (1996).

## VIII  PREEMPTION

■ Defendants assert that plaintiffs' RICO Direct Payment Action and common-law fraud action have been preempted by the federal Cigarette Labeling and Advertising Act ("Labeling Act"). 15 U.S.C. §§ 1331–40.

The Act requires certain uniform warning labels on cigarette packaging and preempts all conflicting state regulation of tobacco product advertising. *See id.* § 1334(b). It provides:

> 'No statement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.'

*Id.*

The Supreme Court addressed the scope of the Labeling Act's preemptive effect in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion). It determined that the Labeling Act merely preempts misrepresentation claims that allege that defendants should have included additional or more clearly stated warnings in their advertisements. *See id.* at 524, 112 S.Ct. 2608.

The *Cipollone* Court made clear, however, that claims of fraud based on intentional misrepresentations and omissions are not preempted reasoning that "[s]uch claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation, the duty not to deceive" and that "Congress offered no sign [in passing the Labeling Act] that it wished to insulate cigarette manufacturers from longstanding rules governing fraud." *Id.* at 528–29, 112 S.Ct. 2608. The Court added that:

> this reading of 'based on smoking and health' is wholly consistent with the purposes of the 1969 Act. State-law prohibitions on false statements of material fact do not create 'diverse, nonuniform, and

confusing' standards. Unlike state-law obligations concerning the warning necessary to render a product 'reasonably safe,' state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity.

*Id.* at 529, 112 S.Ct. 2608.

Plaintiffs RICO Direct Payment Action and common-law fraud action allege "false representation[s] of [ ] material fact[s]" and "concealment of [ ] material fact[s]," making them virtually identical to the non-preempted claims in *Cipollone. Id.* at 528, 112 S.Ct. 2608. Since these allegations are premised on the general "duty not to deceive" rather than a "duty 'based on smoking and health,'" they are not preempted. *Id.* at 528–29, 112 S.Ct. 2608. Federal "preemption by the Cigarette Labeling and Advertising Act does not apply to the deliberate acts to deceive[.]" *H.K. Porter Co. v. American Tobacco Co.,* 71 F.Supp.2d 73, 75 (E.D.N.Y.1999).

## IX CONCLUSION

Defendants' motions for summary judgment with respect to the RICO Settlement, Litigation, and Investment Actions—and related conspiracy actions under § 1962(d)—are granted. *See* Fed. R.Civ.P. 56(c). Their summary judgment motions with respect to the RICO Direct Payment Action and the state fraud action are denied.

Defendants' motion for dismissal based on federal preemption by the Labeling Act is denied. *See* Fed.R.Civ.P. 12(b)(6).

Plaintiffs' state law claims of restitution, contribution, indemnification, unjust enrichment, and unfair competition are stayed pending trial on the RICO Direct Payment Action and state fraud theories. Adjudication of these claims at this juncture would too greatly complicate the court's duties with respect to the issues now going forward for trial. Defendants' motions with respect to these claims are denied with leave to renew upon lifting of the stay.

Defendants' request for certification of an interlocutory appeal pursuant to section 1292(b) of Title 28 is also denied. *See* 28 U.S.C. § 1292(b). To delay proceedings for appellate review on the eve of trial would not advance the ends of justice, and would unnecessarily burden both this court and the court of appeals. *See National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 71 F.Supp.2d 139, 162–66 (1999) (district court certification for interlocutory appeal is discretionary).

Trial will commence on July 17, 2000 with respect to liability and compensatory damages. A punitive damages phase, if required, will follow immediately.

SO ORDERED